UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.    )<br>)<br>VINCENT C. ANZALONE    ) | CRIMINAL NO. 15-10347-PBS |

## MOTION TO DISMISS

### I. INTRODUCTION

Defendant, Vincent Anzalone, respectfully moves the Court pursuant to Fed. R. Crim. R. 12(b)(3) and the Court's supervisory powers for an Order dismissing the indictment in this case, with prejudice, based on outrageous government conduct. This motion arises from the FBI's massive distribution of child pornography from the Playpen website that it controlled between February 19, 2015, and March 4, 2015, as part of the investigation leading to the charges against Mr. Anzalone. The unprecedented nature and scope of the FBI's distribution of contraband in connection with this case has no legal justification or excuse and offends common standards of decency. Accordingly, the Court can and should dismiss the indictment in this case.

### II. STATEMENT OF FACTS

The facts relating to this case are set forth in detail in Mr. Anzalone's accompanying Motion to Suppress. The relevant facts for purposes of this dismissal motion begin with the FBI's

assumption of direct and exclusive control of the Playpen website on February 19, 2015. The FBI maintained and operated the site until at least March 4, 2015. According to discovery, the site had approximately 100,000 visitors during that time (about 50,000 per week). Prior to the FBI's operation of the site, the average number of weekly visitors had been just 11,000. See Defendant's Motion to Suppress, Exh. B. at ¶ 19.

The FBI's operation of the site included actively facilitating the uploading and redistribution of child pornography onto the Internet, actions that require the approval and technical assistance of whoever is operating the site that hosts the pictures and videos. While the site was under FBI control, it also offered thousands of illicit pictures, videos, and links to additional illegal content (which the Government routinely counts the same as pictures and videos for sentencing purposes). The exact numbers have not been disclosed. In response to Orders compelling discovery in companion Playpen cases, the Government has acknowledged that it distributed at least 20,000 pictures, videos and additional links to child pornography, but maintains that it is unable to account for all of the content that was posted on its site. Further, according to the Government, much of the content was available only for a "limited time" and was not tracked by the FBI, and many of the links on the site accessed multiple images and videos.

Setting aside any doubts about the Government's claim that, while it can design sophisticated programs to defeat the Tor

network (see Defendant's Memorandum in Support of Motion to Suppress at 9-11), it is unable to provide a complete and accurate accounting of the images it distributed, there is no dispute that the FBI exponentially increased the number of visitors to the site and released an enormous amount of child pornography.

In companion Playpen cases, the Government has also conceded that, unlike a typical "reverse sting" operation, law enforcement agents made no attempt to control or curtail the redistribution of any of the Playpen contraband. This is true despite the fact that the child pornography on the site was located in specific subdirectories and the FBI had the technical means of allowing visitors to access those parts of the site while blocking them from downloading any of the pictures found there.

### III. ARGUMENT

**THE GOVERNMENT'S GLOBAL DISTRIBUTION OF CHILD PORNOGRAPHY IS OUTRAGEOUS CONDUCT THAT WARRANTS DISMISSAL OF COUNT TWO OF THE INDICTMENT.**

The remedy the defense is seeking is extraordinary, but only because the Government's conduct in this case is unprecedented and would appall the average citizen. Criminal investigations should seek to contain and mitigate the harm caused by illegal activity, not perpetuate that harm and (according to the Government's own oft-repeated statements) "re-victimize" the children depicted in the images that it distributed.

The Supreme Court has long stated that "[r]egard for the requirements of the Due Process Clause 'inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings (resulting in a conviction) in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses.'" Rochin v. California, 342 U.S. 165, 169 (1952) (quoting Malinski v. People of State of New York, 324 U.S. 401, 416-17 (1945)). The Court went on to explain that

> These standards of justice are not authoritatively formulated anywhere as though they were specifics. Due process of law is a summarized constitutional guarantee of respect for those personal immunities which, as Mr. Justice Cardozo twice wrote for the Court, are "so rooted in the traditions and conscience of our people as to be ranked as fundamental" or are "implicit in the concept of ordered liberty."

Id. (citations omitted).

Government conduct that is so outrageous that it offends our shared canons of decency to a degree warranting dismissal of an indictment is rare. United States v. Santana, 6 F.3d 1, 4 (1st Cir. 1993)("the banner of outrageous misconduct is often raised but seldom saluted")(collecting cases). Specifically, an indictment can be dismissed only where the Government's misconduct "is so appalling and egregious as to violate due process by 'shocking ... the universal sense of justice.'" United States v. Luisi, 482 F.3d 43, 59 (1st Cir. 2007). When governmental misconduct involves "nonconstitutional error,"

courts should not dismiss an indictment unless the misconduct resulted in "fundamental" errors that had a "substantial influence" on the outcome of the case. Bank of Nova Scotia v. United States, 487 U.S. 250, 256 (1988). In addition, in cases involving misconduct that results in "an error of constitutional magnitude," courts should also first determine whether other remedies (such as suppression) are available or whether they are "impractical." Id. at 257.

In this case, the Court should find that the Government's misconduct during the investigation of this case warrants dismissal. While another potential remedy has been presented to the Court through defendant's Motion to Suppress, an order of suppression may not adequately convey the level of disapprobation with which the Government's actions should be met. The Court need only consider some of the Government's own pronouncements about the harm caused by the proliferation of child pornography to fully realize how troubling the FBI's Playpen operation is. While the defense does not necessarily agree with some of the Government's more extreme statements about the impact of downloading or distributing illicit pictures, it is impossible to reconcile the Playpen operation with the Government's own view of the harm caused by the proliferation of child pornography.

For example, the Department of Justice's website states the following:

> [V]ictims of child pornography suffer not just from the sexual abuse inflicted upon them to produce child pornography, but also from knowing that their images can be traded and viewed by others worldwide. <u>Once an image is on the Internet, it is irretrievable and can continue to circulate forever</u>. The permanent record of a child's sexual abuse can alter his or her live (sic) forever. Many victims of child pornography suffer from feelings of helplessness, fear, humiliation, and lack of control given that their images are available for others to view in perpetuity.[1]

(Emphasis added). DOJ also routinely emphasizes in its press releases that possessing and circulating pornographic images re-victimizes the children depicted in them. See, e.g., DOJ Press Release, <u>Ellettsville Man Charged with Production of Child Pornography</u>, April 15, 2015 ("Producing and distributing child pornography re-victimizes our children every time it is passed from one person to another.")[2] Indeed, the Government has expressed the view that even looking at an image of child pornography re-victimizes children. See, e.g., FBI.gov, <u>Defendant Sentenced for Possession of Child Pornography</u>, November 5, 2013 (justifying a 108 month sentence for a U.S. Air Force airman who possessed child pornography on the ground that "he caused the young children in these disgusting images to be re-victimized every time he looked at the pictures.").[3]

---

[1] Available at: http://www.justice.gov/criminal-ceos/child-pornography. This statement appears as part of the mission statement for the Child Exploitation and Obscenity Section (CEOS), which apparently approved and supervised the Playpen operation.

[2] Available at: http://www.justice.gov/usao-sdin/pr/ellettsville-man-charged-production-child-pornography.

[3] Available at: https://www.fbi.gov/atlanta/press-releases/2013/defendant-sentenced-for-possession-of-child-pornography. It should be noted here that several studies have determined that most child pornography possession and distribution offenders have no

The harm caused by simply possessing, let alone distributing, illegal pictures is one that is also routinely emphasized by the Government and accepted by the courts. The continuing harm to the victims of this hideous form of child abuse is the distribution of the photographs and videos in which the victims appear. See United States v. Kearney, 672 F.3d 81, 94 (1st Cir. 2012) (internal citations omitted). For example, in a sentencing memo for a defendant convicted of possession and distribution, the Government explained its views as follows:

> Trafficking in child pornography is not a victimless crime. Each child whose image the defendant traded, collected, viewed and stored on his computer was a victim. The defendant's interest in trading pictures with others and viewing children posing nude, in sexually explicit positions, or actually engaged in sexual activity, is an interest that our society should not tolerate because it causes innocent children to be victimized and abused by those who create the images and those who view them.
> . . .
> The distribution of photographs and films depicting sexual activity by juveniles is intrinsically related to the sexual abuse of children in at least two ways. First, the materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation. Second, <u>the distribution network for child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled</u>.
> . . .

---

history of molesting minors and pose no significant future risk of doing so in the future. See, e.g., Endrass et al, The Consumption of Internet Child Pornography and Violent Sex Offending, BMC Psychiatry (2009).

> It is difficult to imagine the impact on these children of being raped and sexually exploited. How is that impact worsened when the child knows that photos of her victimization are circulated around the world and "enjoyed" by people such as the defendant?

United States v. Girard LaFortune, 03-10366-PBS, D.E. 88 (Govt. Sentencing Memo) at 5-7 (emphasis added)(citations omitted).

Indeed, the Government insists that the people who distribute are more culpable than people who view the pornography. According to the Government, distributors make pornography available to far more people than average picture collectors because they "expand[] the universe of [victim] images on the Internet." Brief of the United States, United States v. Kearney, 2011 WL 5323308 at 49. The First Circuit has echoed the government's position:

> The Supreme Court has repeatedly explained, for thirty years, that individuals depicted in child pornography are harmed by the continuing dissemination and possession of such pornography containing their image. Such materials are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation. . . Indeed, the Court has stated that as a permanent record of a child's abuse, the continued circulation itself would harm the child who had participated. Like a defamatory statement, <u>each new publication of the speech would cause new injury</u> to the child's reputation and emotional well-being."

Kearney, 672 F.3d at 94 (1st Cir. 2012) (citations omitted)(emphasis in original). See also United States v. Dyer, 589 F.3d 520, 526-27 (1st Cir. 2009)("child pornography victimizes children not only at the time of actual abuse but each time the image is accessed and distributed anew.").

In this case, the FBI has made no effort to determine if the pictures and videos posted on Playpen while under its control were "known" images that had been previously circulated on the Internet or if it was aiding and encouraging the production and distribution of new images. The FBI's conduct is all the more troubling in light of the fact that it somehow managed to increase the number of visitors to Playpen while it was under Government control from an average of 11,000 weekly visitors to approximately 50,000 per week.

Lest the Government miss the point of highlighting its statements, the issue here is not whether the possession or distribution of child pornography has harmful effects, or whether the children who were abused in the making of such horrible images are deserving of the utmost sympathy and care. The issue instead is how, while decrying the long-term and widespread consequences to those portrayed of even someone viewing illicit images, the Government can justify the massive distribution of child pornography that it accomplished in this case.

It is no answer that the FBI did this as part of an effort to apprehend people who view or download child pornography. Setting aside the dubious morality of asserting that the investigative ends justify such outrageous means, 18 U.S.C. § 3509(m) expressly requires that "any property that constitutes child pornography . . . shall remain in the care, custody and control of the Government" or a court. And, as a practical

matter, the FBI had other ways of targeting Playpen visitors who wanted to access illegal content.

For example, in other investigations, the FBI has monitored child pornography sites and posted links to pictures or videos with explicit titles. When a visitor to the forum clicked on a link, a "Network Investigative Technique" could seize identifying data about the visitor, but the link itself would be blocked or an "error" message would appear. Alternatively, investigators can use a "spoofing" system, where visitors to a target site are secretly redirected to a server with a facsimile of the site, minus any content or links that investigators do not want accessible or downloadable. The Government has also used child erotica or "virtual" child pornography to lure targets in other cases, which would address any concerns agents might have had about "tipping off" suspects if sexual content was removed from the site entirely. See Corey Young, FBI Allowed for More Victimization by Permitting a Child Pornography Website, New York Times (January 27, 2016) (discussing some of the investigatory alternatives and criticizing the "immoral and inexcusable" Playpen operation).[4]

Indeed, in this case, the Government maintains that it was authorized to search the personal computers of anyone who merely visited Playpen's home page. See Exh. B to Defendant's

---

[4] Available at: http://www.nytimes.com/roomfordebate/2016/01/27/the-ethics-of-a-child-pornography-sting/fbi-allowed-for-more-victimization-by-permitting-a-child-pornography-website.

Memorandum in Support of Motion to Suppress at § 32. If that is true, there was clearly no investigatory need for the FBI to allow visitors to post new child pornography on the site or download the pornography that was available in specific subdirectories. While law enforcement agents often use contraband, like drugs or guns, as part of undercover "buys" or to execute a sting operation, they only do so when necessary. They also make every effort to control, track and recover the contraband they are using. Here, by contrast, what the Government did is comparable to flooding a neighborhood with heroin in the hope of snaring an assortment of low-level drug users. Compare also DOJ, Office of the Inspector General, A Review of the ATF's Operation Fast and Furious and Related Matters (September, 2012) (criticizing DOJ's handling of "gun walk" investigations that resulted in the uncontrolled distribution of numerous firearms).[5]

Online investigations are especially sensitive and problematic because agents have no ability to control the

---

[5] Available at https://oig.justice.gov/reports/2012/s1209.pdf. See also, e.g., http://democrats.oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/7-26-11-Full-Committee-Hearing-Transcript.pdf at 18-19 (testimony of ATF Senior Special Agent Jose Wall):

> I was skeptical when the first whistle-blower came to this committee with allegations of hundreds maybe thousands of guns being allowed to walk into the country of Mexico. I could not believe that someone in ATF would so callously let firearms wind up in the hands of criminals, but it appears that I was wrong…What the persons approving this debacle failed to realize is that the end does not justify the means.

redistribution of pictures, malware or other contraband once they are introduced to the Internet. As a result, the Department of Justice (DOJ) itself cautions its attorneys and agents about the harms that can arise from online investigations and requires special approval for operating any type of "online undercover facility." DOJ, <u>Online Investigative Principles for Federal Law Enforcement Agents</u> (available at: <u>https://info.publicintelligence.net/DoJ-OnlineInvestigations.pdf</u>). DOJ's investigative principles emphasize that law enforcement agencies must consider several sensitive issues when determining whether to approve the establishment of an online undercover facility:

> First, online undercover facilities that offer the public access to information or computer programs that may be used for illegal or harmful purposes may have greater capacity than similar physical-world undercover entities to cause unintended harm to unknown third parties. <u>Because digital information can be easily copied and communicated, it is difficult to control distribution in an online operation and so limit the harm that may arise from the operation</u>.

<u>Id.</u> at 44 (p. 57 of the PDF) (emphasis added).

The statement of principles goes on to caution that the use of online undercover facilities raises complex legal and policy issues, "especially if law enforcement agents seek to use the system administrator's powers for criminal investigative purposes." These include "unique and sensitive policy issues involving privacy, international sovereignty, and unintended harm to unknown third parties." <u>Id.</u> at x (p. 11 of the PDF). Because of these concerns, DOJ requires any investigation

involving an online undercover facility to undergo a special review and approval process. Id. Upon information and belief, the Government has refused to disclose its review and approval records in this case.

DOJ's guidelines also compares online "sting" operations with other operations employing tools of criminality. Using an example of selling "cloned phones," DOJ pointed out that agents "can prevent or minimize the potential for harm caused by their activities by, for example, arresting targets before they can use the phones or requesting the cellular carrier to block or limit access by these particular phones to the cellular network." Id. at 44 (p. 57 of the PDF). Even when that cannot occur, the harm is constrained by the fact that "a single 'clone phone' can only be used by one individual at a time and cannot be duplicated and redistributed to multiple users." Id.

Similar limits, however, are difficult or impossible to impose on online undercover operations, as DOJ cautions in its policy statement:

> [T]he online facility is likely to be automated, making it difficult for the agents to limit who obtains the tools or the damage that the tools end up causing to innocent third parties. Further, unlike the clone phone, the hacker tools can be <u>endlessly replicated and distributed to others in a manner that law enforcement agents cannot easily control.</u>

Id. at 45 (p. 58 of PDF) (emphasis added).

Unfortunately, in this case, the FBI took no measures whatsoever to control the replication and distribution of pictures and videos from its undercover website. The Government

has also so far denied that it has any responsibility to the victims depicted in the pictures that it distributed, despite the pronouncements quoted above, and has made no effort to address its statutory obligation under 18 U.S.C. § 2255 (providing civil redress for the minor victims of pornography offenses) to make restitution to all known victims whose images were posted and distributed by the FBI.

## IV. CONCLUSION

For the reasons stated above, the Court should schedule a hearing to determine the true extent of the harm caused by the Government's investigatory tactics and dismiss Count Two of the indictment if the Court finds that the governmental conduct leading to the charges against Mr. Anzalone cannot be reconciled with fundamental expectations of decency and fairness.

VINCENT ANZALONE
By his attorney,

/s/ Timothy G. Watkins
Timothy G. Watkins
Federal Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
Tel: 617-223-8061

CERTIFICATE OF SERVICE

    I, Timothy G. Watkins, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on May 13, 2016.

                                /s/ Timothy G. Watkins
                                Timothy G. Watkins