## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL NO. 15-10347-PBS** |
| | ) | |
| **VINCENT C. ANZALONE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS

Now comes the United States of America, by and through attorneys, Carmen M. Ortiz,

United States Attorney for the District of Massachusetts, and David G. Tobin, Assistant United

States Attorney, and submits its response in opposition to Defendant's Motion to Suppress

[Docket No. 47].    For the reasons set forth below, Defendant's motion should be denied.

### INTRODUCTION

After a months-long investigation, the FBI briefly assumed administrative control of

"Playpen," a website dedicated to the sharing of child pornography.    The FBI also sought and

obtained a warrant permitting it to deploy a "Network Investigative Technique" (the "NIT")

during that same period, which would cause a computer logging into Playpen to reveal certain

identifying information—most importantly, its concealed Internet Protocol ("IP") address.

Among the IP addresses identified accessing Playpen was one associated with Defendant.

Following the execution of a search warrant at Defendant's home in Brighton, Massachusetts, a

federal grand jury in Boston, Massachusetts returned a two-count Indictment charging

Defendant, in Count One, with Possession of Child Pornography, in violation of 18 U.S.C.

§2252A(a)(5)(B), and, in Count Two, with Receipt of Child Pornography, in violation of 18

U.S.C. §2252A(a)(2)(A).    Defendant now seeks to suppress the information obtained by the

NIT and used to identify his home computer and its location, along with all other evidence

derived from that information.    In a separate motion, Defendant also seeks to dismiss Count Two of the Indictment on the grounds that the government engaged in outrageous conduct by allegedly distributing child pornography.    The government will file a separate response to Defendant's Motion to Dismiss.

Defendant argues the following five grounds in support of his Motion to Suppress:

(1)     the remote search of his home computer was executed pursuant to a warrant unsupported by probable cause;

(2)     the FBI intentionally or recklessly misled the issuing court about facts salient to probable cause [Defendant asks this court to hold a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978)];

(3)     the vast authority granted to the executing agents by the NIT warrant was bereft of particularity effectively created what can be characterized as the Internet age equivalent to a general warrant;

(4)     the NIT warrant was an anticipatory warrant where the "triggering event" that would establish probable cause for searches did not occur and therefore the warrant should not have been executed; and

(5)     The magistrate Judge in the Eastern District of Virginia had no jurisdiction to issue the NIT Warrant and consequently the warrant was void *ab initio.*

Def's Mot. to Suppress, at 1,2, No. 15-10347-PBS, (D. Mass Date).

For the reasons that follow, Defendant's motions should be denied.

*First*, the affidavit supporting the NIT warrant application established the need for the NIT to identify Playpen users and set forth ample probable cause to conclude that any users of Playpen knew of its illicit content and intended to access that content.    As the affidavit

explained, Playpen was no ordinary website, but a hidden service operating on an anonymous network that was dedicated to the sharing of child pornography.   The magistrate judge who authorized the NIT warrant reasonably concluded that there was a fair probability that anyone who logged into Playpen did so with knowledge of its content and intent to view that content.

*Second*, the defendant makes no showing—much less a substantial, preliminary one—to justify a *Franks* hearing.   He points to a change to the Playpen logo that occurred hours before the NIT warrant was authorized that was not included in the affidavit.   But, he does not offer any proof that this omission was intentional or reckless, nor can he.   It was, at most, an innocent oversight.   The change—the replacement of two sexually suggestive photos of a prepubescent girl with a single sexually suggestive photo of a prepubescent girl—was immaterial.   So, even if the defendant could somehow show the affiant acted intentionally or recklessly, he would not be entitled to relief.   His remaining *Franks* arguments consist of little more than a disagreement with the opinions and conclusions of the veteran FBI agent contained within his affidavit, none of which suffice to justify a *Franks* hearing.

*Third*, the NIT warrant described the places to be searched and the items to be seized with particularity and was supported by probable cause.   The Fourth Amendment demands nothing more.   The Court should not embrace the defendant's novel and unsupported constitutional rule—cloaked as a challenge to the warrant's particularity and overbreadth—that would find an otherwise valid warrant defective simply because it would authorize the search of a potentially large number of locations.

*Fourth*, the defendant's claim that the NIT warrant was void because, as an anticipatory warrant, the "triggering event" never occurred is incorrect and little more than a rehash of the same probable cause and *Franks* challenges he raises.

*Fifth*, the issuance of the NIT warrant did not violate Rule 41, the Federal Magistrates

Act, and was reasonable under the Fourth Amendment.

*Finally*, even if the NIT warrant were somehow flawed, the good faith exception is an

independent bar to suppression.    The NIT warrant affidavit set forth probable cause for its

request to search particular locations for particular information.    And, a neutral and detached

magistrate relied on that affidavit in authorizing the warrant.    Law enforcement's reliance on

that authorization was therefore objectively reasonable and suppression is thus unwarranted.

For these and the other reasons outlined below, the defendant's Motion to Suppress

should be denied.[1]

---

[1]       The government notes that the same arguments the defendant raises in support of his
Motion to Suppress have been raised and rejected in related litigations against other Playpen users,
which involved the same NIT as here.    For example, on January 28, 2016, a district judge in the
Western District of Washington rejected a defendant's argument that the same NIT warrant was an
unconstitutional "general warrant."    *United States v. Michaud*, No. 3:15-cr05351-RJB, 2016 WL
337263, at *4-5 (W.D. Wa. Jan. 28, 2016).    The judge had already orally denied the defendant's
motion for a *Franks* hearing and his arguments that the NIT warrant lacked probable cause at the
motions hearing.    *Id.* at *1 & n.1.    In *Michaud*, the Court ultimately concluded that "[t]he NIT
warrant was supported by probable cause and particularly described the places to be searched and
the things to be seized" and further concluded that the NIT warrant was executed in good faith.
*Id.* at *8.

Additionally, on March 14, 2016, a district judge in the Eastern District of Wisconsin
adopted a magistrate judge's report and recommendation denying a defendant's motion to
suppress the NIT warrant.    *United States v. Epich,* No. 15-CR-163-PP, slip. op. at 5-6 (E.D. Wis.
Mar. 14, 2016).    In that case, the defendant argued that the NIT warrant "failed to establish
probable cause, was not specific in describing how the NIT would find users of the web site and
how it would make sure to find only users who engaged in illegal activity, and did not demonstrate
that the NIT was likely to reveal evidence of a crime, and was unlimited in geographic scope."    *Id.*
at *1.

Further, on February 19, 2016, a district court in the Southern District of Ohio also denied
a motion to suppress the NIT search warrant.    *See United States v. Stamper*, No. 1:15cr190 (S.D.
Ohio February 19, 2016), ECF No. 48.    The court found no distinguishing characteristics between
*Stamper* and *Michaud.*

The Court agrees that 'a reasonable reading of the NIT Warrant's scope gave the
FBI authority to deploy the NIT from a government-controlled computer in the

# BACKGROUND

The charges in this case arise from an investigation into Playpen, a global online forum through which registered users (including Defendant) advertised, distributed, and/or accessed illegal child pornography.   The scale of child sexual exploitation on the site was massive: more than 150,000 total members created and viewed tens of thousands of postings related to child pornography.   Images and videos shared through the site were highly categorized according to victim age and gender, as well as the type of sexual activity.   The site also included forums for discussion of all things related to child sexual exploitation, including tips for grooming victims and avoiding detection.

## I.      Playpen users, including Defendant, used the Tor network to access child pornography while avoiding law enforcement detection

Playpen operated on the anonymous Tor network.   Tor was created by the U.S. Naval Research Laboratory as a means of protecting government communications.   It is now available

---

Eastern District of Virginia against anyone logging onto Website A, with any information gathered by the NIT to be returned to the government-controlled computer in the Eastern District of Virginia.'

*Id.* at 18.   The court also found that the warrant was reasonable as to the scope of the information searched.   *Id.*   And, even if the court were to find that the search warrant was not valid, the court found that the good faith exception applied pursuant to *United States v. Leon, 468 U.S. 897, 914 (1984).   Id.* at 19-21.   *See also United States v. Werdene*, No. 2:15cr434, 2016 WL 3002376 (E.D. Pa. May 19, 2016) (finding same).

Further, in a two recent decision in the Eastern District of Virginia, a district judge rejected defense arguments almost identical to the arguments made in the case now before this court.   See *United States v. Darby*, No. 2:16cr36, 2016 WL 3189703 (E.D. Va. June 3, 2016);
.  *But see United States v. Levin*, No. 15-10271-WGY, 2016 WL 2596010 (D. Mass. May 5, 2016); *United States v. Arterbury,* No. 15-CR-182-JHP (N.D. Okla. Apr. 25, 2016).

Additionally, Defendant had no reasonable expectation of privacy in the information obtained by the NIT and therefore the deployment of the NIT was not a search under the Fourth Amendment and a warrant was not needed.   *See Darby*, 2016 WL 3189703.

to the public.    The Tor network—and the anonymity it provides—is a powerful tool for those

who wish to share ideas and information, particularly those living in places where freedom of

speech is not accorded the legal protection it is here.    But this anonymity has a downside.    The

Tor network is a haven for criminal activity in general, and the online sexual exploitation of

children in particular.    *See* "Over 80 Percent of Dark-Web Visits Relate to Pedophilia, Study

Finds," WIRED MAGAZINE, December 30, 2014, available at: http://www.wired.com/2014/12/80-

percent- dark-web-visits-relate-pedophilia-study-finds/ (last visited March 31, 2016).

Use of the Tor network masks the user's actual IP address, which could otherwise be used

to identify a user, by bouncing user communications around a network of relay computers (called

"nodes") run by volunteers.[2]    To access the Tor network, users must install Tor software either by

downloading an add-on to their web browser or the free "Tor browser bundle." Users can also

access Tor through "gateways" on the open Internet that do not provide users with the full

anonymizing benefits of Tor.    When a Tor user visits a website, the IP address visible to that site

is that of a Tor "exit node," not the user's actual IP address.    Tor is designed to prevent tracing the

user's actual IP address back through that Tor exit node.    Accordingly, traditional

IP-address-based identification techniques used by law enforcement on the open Internet are not

viable.

Within the Tor network itself, certain websites, including Playpen, operate as "hidden

services."    Like other websites, they are hosted on computer servers that communicate through IP

addresses.    They operate the same as other public websites with one critical exception: namely,

the IP address for the web server is hidden and replaced with a Tor-based web address, which is a

series of sixteen algorithm-generated characters followed by the suffix ".onion."    A user can only

---

[2] Additional information about Tor and how it works can be found at www.torproject.org.

reach a "hidden service" by using the Tor client and operating in the Tor network.   And unlike an open Internet website, it is not possible to use public lookups to determine the IP address of a computer hosting a "hidden service."

A "hidden service," like Playpen, is also more difficult for users to find.   Even after connecting to the Tor network, users must know the exact web address of a "hidden service" in order to access it.   Accordingly, in order to find Playpen, a user had to first get the web address for it from another source—such as another Playpen user or online postings identifying Playpen's content and location.   Accessing Playpen thus required numerous affirmative steps by the user, making it extremely unlikely that any user could have simply stumbled upon it without first understanding its child pornography-related content and purpose.

Although the FBI was able to view and document the substantial illicit activity occurring on Playpen, investigators faced a tremendous challenge when it came to identifying Playpen users. Because Tor conceals IP addresses, normal law enforcement tools for identifying Internet users would not work.   So even if law enforcement managed to locate playpen and its IP logs, traditional methods of identifying users would have gone nowhere.

Acting on a tip from a foreign law enforcement agency, as well as information from its own ongoing investigation, the FBI determined that the computer server that hosted Playpen was located at a web-hosting facility in North Carolina.   In February 2015, FBI agents apprehended the administrator of Playpen and seized the website from its web-hosting facility.   Rather than immediately shut the site down, which would have allowed the users of Playpen to go unidentified (and un-apprehended), the FBI allowed it to continue to operate at a government facility in the Eastern District of Virginia for the brief period from February 20, 2015 through March 4, 2015.

In addition, the FBI obtained court authorizations from the United States District Court for the Eastern District of Virginia to (1) monitor the site users' communications, and (2) deploy a Network Investigative Technique ("NIT") on the site, in order to attempt to identify registered users who were anonymously engaging in the sexual abuse and exploitation of children, and to locate and rescue children from the imminent harm of ongoing abuse and exploitation.[3]

Using the NIT, the FBI identified an IP address associated with Playpen user "God111," who ultimately was determined to be Defendant.    According to data derived from the NIT, Defendant originally registered an account on Playpen on February 19, 2015, and was actively logged into Playpen for a total of 12 hours, 1 minute and 24 seconds between February 19, 2015 and March 5, 2015.

On October 20, 2015, United States Magistrate Judge Judith Gail Dein issued a search warrant for Defendant's residence at 114 Antwerp Street, Apartment A, in Brighton, Massachusetts.   The search warrant was executed on October 21, 2015, at about 6:50 a.m., when members of the FBI Child Exploitation Task Force made peaceful entry into 114 Antwerp Street, Apartment A. Members of law enforcement identified themselves and advised the two occupants of the residence that they were in possession of a search warrant. The two occupants in the residence at the time of entry were identified as Susan Hague and Defendant.

After securing the residence, FBI Special Agent Eric Slaton and Task Force Officer Sullivan conducted an audio recorded interview of Defendant.   Defendant was advised of his *Miranda* warnings, acknowledged that he understood his rights, signed an FBI advice of rights form and agreed to speak with law enforcement.

---

[3] Publicly filed, redacted copies of the NIT search warrant, application, affidavit and return (No. 15-SW-89) are attached as Exhibit A.

During the interview, Defendant initially denied having a TOR browser or possessing child pornography.   Defendant eventually admitting to having a TOR browser and to possessing child pornography.   Defendant stated he downloaded child pornography three to four times a week and would masturbate when viewing the child pornography.   Defendant reported downloading child pornography for a "long time," "five or six years."   He admitted to using TOR for the previous five years and that prior to TOR he used "E-Mule," a peer to peer file sharing network.   Defendant stated that the videos he downloaded were of females 7 to 13 years-old engaged in sexual activity. Defendant said he believe there was 50 to 100 gigabits of child pornography on this computer.

Defendant also admitted to touching multiple children is a sexualized manner starting when he was 17 years-old and as recently as approximately ten years ago.   He admitted to "groping" an eleven year old child when he was 17 years-old, and to inserting his finger into the anus of a ten-year-old child during the same time period.

## II.     The nature of Playpen and the Tor network required law enforcement to seek court approval and to deploy a NIT to identify criminals engaged in the creation, advertisement, and distribution of child pornography.

The 31-page NIT search warrant affidavit was sworn by a veteran FBI agent with 19 years of federal law enforcement experience and particular training and experience investigating child pornography and the sexual exploitation of children.   Ex. A at 1, ¶ 1.   It clearly and comprehensively articulated probable cause to deploy the NIT to obtain IP address and other computer-related information that would assist in identifying registered site users who were using anonymizing technology to conceal online child sexual exploitation on a massive scale.

**A.      The NIT warrant set forth in great detail the technical aspects of the investigation that justified law enforcement's request to use the NIT.**

In recognition of the technical and legal complexity of the investigation, the affidavit included: a three-page explanation of the offenses under investigation,     Ex. A at 2-4, ¶ 4; a seven-page section setting out definitions of technical terms used in the affidavit, *Id.* at 4-10, ¶ 5; and a three-page explanation of the Tor network, how it works, and how users could find a hidden service such as Playpen, *Id.* at 10-13, ¶¶ 7-10.   The affidavit spelled out the numerous affirmative steps a user would have to go through just to find the site.   Indeed, the agent explained,

> Even after connecting to the Tor network, however, a user must know the web address of the website in order to access the site.   Moreover, Tor hidden services are not indexed like websites on the traditional Internet.   Accordingly, unlike on the traditional Internet, a user may not simply perform a Google search for the name of one of the websites on Tor to obtain and click on a link to the site.   A user might obtain the web address directly from communicating with other users of the board, or from Internet postings describing the sort of content available on the website as well as the website's location.   For example, there is a Tor "hidden service" page that is dedicated to pedophilia and child pornography.   That "hidden service" contains a section with links to Tor hidden services that contain child pornography.   [Playpen] is listed in that section.

*Id.* at 12-13, ¶ 10.   Thus, the agent continued, "[a]ccessing [Playpen] ... requires numerous affirmative steps by the user, making it extremely unlikely that any user could simply stumble upon [it] without understanding its purpose and content." *Id.*

**B.      Playpen was dedicated to the advertisement and distribution of child pornography, a fact that would have been apparent to anyone who viewed the site.**

The affidavit also described, in great detail and in stark terms, the purpose of Playpen and why its users were appropriate targets for the NIT.   Playpen was "dedicated to the advertisement and distribution of child pornography," "discussion of... methods and tactics offenders use to abuse children," and "methods and tactics offenders use to avoid law enforcement detection while

perpetrating online child sexual exploitation crimes."   *Id.* at 6, ¶ 10.   More to the point,

"administrators and users of [Playpen] regularly sen[t] and receive[d] illegal child pornography

via the website." *Id.*   The agent also explained the sheer scale of the illicit activity occurring on

Playpen: site statistics as of February 3, 2015, for Playpen—which was believed to have been in

existence only since August of 2014—showed that it had 158,094 members, 9,333 message

threads, and 95,148 posted messages.[4]   *Id.* at 13, ¶ 11.

      Playpen's illicit purpose was also apparent to anyone who visited it during the six months it

operated before the FBI seized control of it.   "[O]n the main page of the site, located to either side

of the site name were two images depicting partially clothed prepubescent females with their legs

spread apart." *Id.* at 13, ¶ 12.   And the following text appeared beneath those young girls: "No

cross-board reposts, .7z preferred, encrypt filenames, include preview, Peace out."   While those

terms may have seemed insignificant to the untrained eye, the affiant explained, based on his

training and his experience, that the phrase "no cross-board reposts" referred to a "prohibition

against material that is posted on other websites from being "re-posted" to Playpen and that ".7z"

referred to a "preferred method of compressing large files or sets of files for distribution."   *Id.* at

13-14, ¶ 12.   The combination of sexualized images of young girls along with these terms of art

referencing image posting and large file compression unmistakably marked Playpen as just what it

was—a hub for the trafficking of illicit child pornography.

---

[4] As the affidavit explained, a bulletin board website such as Playpen is a website that provides members with the ability to view postings by other members and make postings themselves. Postings can contain text messages, still images, video images, or web addresses that direct other members to specific content the poster wishes.   Bulletin boards are also referred to as "internet forums" or "message boards." A "post" or "posting" is a single message posted by a user.   Users of a bulletin board may post messages in reply to a post.   A message "thread," often labeled a "topic," refers to a linked series of posts and reply messages.   Message threads or topics often contain a title, which is generally selected by the user who posted the first message of the thread. Ex. A at 4, ¶ 5(a).

The affidavit also explained that users were required to register an account by creating a username and password before they could access the site and highlighted the emphasis the registration terms placed on users avoiding being identified.   Users clicking on the "register an account" hyperlink on the main page were required to accept registration terms, the entire text of which was included in the affidavit.   *Id.* at 14-15, ¶¶ 12-13.   Playpen repeatedly warned prospective users to be vigilant about their security and the potential of being identified, explicitly stating, "the forum operators do NOT want you to enter a real [e-mail] address," users "should not post information [in their profile] that can be used to identify you," "it is impossible for the staff or the owners of this forum to confirm the true identity of users," "[t]his website is not able to see your IP," and "[f]or your own security when browsing or Tor we also recomend [sic] that you turn off javascript and disable sending of the 'referer' header."   *Id.* at 14-15, ¶ 13.   This focus on anonymity is entirely consistent with the desire on the part of Playpen administrators and users to evade detection of their illicit activities.

Once a user accepted those terms and conditions, a user was required to enter a username, password, and e-mail address.   *Id.* at 15, ¶ 14.   Upon successful registration, all of the sections, forums, and sub-forums, along with the corresponding number of topics and posts in each, were observable.   *Id.* at 15, ¶ 14.   The vast majority of those sections and forums were categorized repositories for sexually explicit images of children, sub-divided by gender and the age of the victims.   For instance, within the site's "Chan" forum were individual sub-forums for "jailbait" or "preteen" images of boys and girls.   *Id.* at 15, ¶ 14.   There were separate forums for "jailbait videos" and "Jailbait photos" featuring boys and girls.   *Id.*   The "Pre-teen Videos" and "Pre-teen Photos" forums were each divided into four sub-forums by gender and content, with "hardcore" and "softcore" images/videos separately categorized for Boys and Girls.   *Id.* at 16, ¶ 14.   A

"Webcams" forum was divided into Girls and Boys sub-forums.   *Id.*   The "Potpurri" forum contained subforums for incest and "Toddlers." *Id.*

The affidavit also described, in graphic detail, particular child pornography that was available to all registered users of Playpen, including images of prepubescent children and toddlers being sexually abused by adults.   *Id.* at 17-18, ¶ 18.   Although the affidavit clearly stated that "the entirety of [Playpen was] dedicated to child pornography," it also specified a litany of site sub-forums which contained "the most egregious examples of child pornography" as well as "retellings of real world hands on sexual abuse of children."   *Id.*   at 20-21, ¶ 27.

The affidavit further explained that Playpen contained a private messaging feature that allowed users to send messages directly to one another.   The affidavit specified that "numerous" site posts referenced private messages related to child pornography and exploitation, including an example where one user wrote to another, "I can help if you are a teen boy and want to fuck your little sister, write me a private message." *Id.* at 18-19, ¶ 21.   According to the affiant's training and experience and law enforcement's review of the site, the affiant stated his belief that the site's private message function was being used to "communicate regarding the dissemination of child pornography." *Id.* at   19, ¶ 22.   The affidavit also noted that Playpen included multiple other features intended to facilitate the sharing of child pornography, including an image host, a file host, and a chat service.   *Id.* at 19-20, ¶¶ 23-25.   All of those features allowed site users to upload, disseminate, and access child pornography.   And, the affidavit included detailed examples and graphic descriptions of prepubescent child pornography disseminated by site users through each one of those features.   *Id.*

**C.    The affidavit and attachments explained what the NIT would do and precisely identified the seven pieces of information it would collect and send back to government-controlled computers.**

The affidavit contained a detailed and specific explanation of the NIT, its necessity, how and where it would be deployed, what information it would collect, and why that information constituted evidence of a crime.

Specifically, the affidavit noted that without the use of the NIT "the identities of the administrators and users of [Playpen] would remain unknown" because any IP address logs of user activity on Playpen would consist only of Tor "exit nodes," which "cannot be used to locate and identify the administrators and users."   Ex. A at 22, ¶ 29.   Further, because of the "unique nature of the Tor network and the method by which the network ... route[s] communications through multiple other computers,... other investigative procedures that are usually employed in criminal investigations of this type have been tried and have failed or reasonably appear to be unlikely to succeed." The affiant thus concluded, "using a NIT may help FBI agents locate the administrators and users" of Playpen.   *Id.* at 23-24, ¶¶ 31-32.   Indeed, he explained, based upon his training and experience and that of other officers and forensic professionals, the NIT was a "presently available investigative technique with a reasonable likelihood of securing the evidence necessary to prove ... the actual location and identity" of Playpen users who were "engaging in the federal offenses enumerated" in the warrant.   *Id.* at 23, ¶ 31.

In terms of the deployment of the NIT, the affidavit explained that the NIT consisted of additional computer instructions that would be downloaded to a user's computer along with the other content of Playpen that would be downloaded through normal operation of the site.   Ex. A at 24, ¶ 33.   Those instructions, which would be downloaded from the website located in the Eastern District of Virginia, would then cause a user's computer to transmit specified information to a

14

government-controlled computer.  *Id.*   The discrete pieces of information to be collected were

detailed in the warrant and accompanying Attachment A, along with technical explanations of the

terms.   They were limited to the following: (1) the actual IP address assigned to the user's

computer; (2) a unique identifier to distinguish the data from that collected from other computers;

(3) the operating system running on the computer; (4) information about whether the NIT had

already been delivered to the computer; (5) the computer's Host Name; (6) the computer's active

operating system username; and (7) the computer's Media Access Control (MAC) address.  *Id.* at

24-25, ¶ 34.

The affidavit explained exactly why the information "may constitute evidence of the

crimes under investigation, including information that may help to identify the... computer and its

user."  *Id.* at 26, ¶ 35.   For instance:

> the actual IP address of a computer that accesses [Playpen] can be associated with
> an ISP and a particular ISP customer.   The unique identifier and information about
> whether the NIT has already been delivered to an "activating" computer will
> distinguish the data from that of other "activating" computers.   The type of
> operating system running on the computer, the computer's Host Name, active
> operating system username, and the computer's MAC address can help to
> distinguish the user's computer from other computers located at a user's premises.

*Id.*

The affidavit specifically requested authority to deploy the NIT each time any user logged

into Playpen with a username and a password.  *Id.* at 26, ¶ 36.   However, the affidavit disclosed

to the magistrate that, "in order to ensure technical feasibility and avoid detection of the technique

by suspects under investigation," the FBI might "deploy the NIT more discretely against particular

users, including those who "attained a higher status" on the site or "in particular areas of

[Playpen]" such as the sub-forums with the most egregious activity which were described

elsewhere in the affidavit.  *Id.* at 24-25, ¶ 32, n. 8.   Finally, the affidavit requested authority for

the NIT to "cause an activating computer – wherever located – to send to a computer controlled by

or known to the government... messages containing information that may assist in identifying the

computer, its location, other information about the computer and the user of the computer." *Id.* at

29-30, ¶ 46(a).

**D. Hours before the NIT warrant was signed, Playpen's administrator changed the site logo, replacing two sexually suggestive images of a prepubescent girl with one sexually suggestive image of a prepubescent girl.**

As noted above, among the things described in the NIT warrant affidavit was Playpen's site

logo: "on the main page of the site, located to either side of the site name, were two images

depicting partially clothed prepubescent females with their legs spread apart."   Ex. A at 13, ¶ 12.

A screenshot showing this logo as of February 3, 2015, is attached as Exhibit B.   Between

September 16, 2014 and February 3, 2015, FBI agents reviewed Playpen in an undercover capacity

to document the activity on the site.   Ex. C at 13, ¶ 11.   Sometime before February 18, 2015,

Playpen's administrator changed the URL—the site address.   Noticing that the URL had changed,

the affiant visited Playpen on February 18, 2015, and confirmed that the content had not changed.

*Id.* at 13, ¶ 11 n.3.   This included the site logo.

In the evening of February 19, 2015, the FBI executed a search at the Florida home of the

Playpen administrator and apprehended him.   *Id.* at 23, ¶ 30.   At that point, the FBI also assumed

control of Playpen.   Postings by the administrator from earlier in the day show that just before he

was arrested, the administrator changed Playpen's site logo, replacing the images described above

with a single image showing a prepubescent girl, wearing a short dress and black stockings,

reclined on a chair with her legs crossed and posed in a sexually suggestive manner.   The text

described in the affidavit as part of the logo, "[n]o cross-board reposts, .7z preferred, encrypt

filenames, include preview," which the affidavit explained pertain to image distribution, remained

unchanged.   *Compare* Ex. A at 13, ¶ 12 and Ex. B, Ex. C.

The NIT warrant was sworn to and authorized at 11:45 a.m. on February 20, 2015, the day

after the logo change.   The affidavit did not reference this change.

## ARGUMENT

**I.      The NIT warrant affidavit amply supports the magistrate's finding of probable cause for issuance of the NIT warrant**

The Supreme Court defines probable cause to search as "a fair probability that

contraband or evidence of a crime will be found in a particular place."   *Illinois v. Gates*, 462

U.S. 213, 238 (1983).   It is a fluid concept that focuses on "the factual and practical

considerations of everyday life on which reasonable and prudent men, not legal technicians, act."

*Id. at 231.*   Recognizing that reasonable minds may differ regarding whether a particular

affidavit establishes probable cause, the Supreme Court "concluded that the preference for

warrants is most appropriately effectuated by according 'great deference' to a magistrate's

determination."   *United States v. Leon*, 468 U.S. 897, 914 (1984) (quoting *Spinelli v. United

States*, 393 U.S. 410, 419 (1969).

"[T]he task of a reviewing court is not to conduct a *de novo* determination of probable

cause, but only to determine whether there is substantial evidence in the record supporting the

magistrate's decision to issue the warrant."   *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984).

**A.   The facts contained in the affidavit, along with the reasonable inferences to be drawn therefrom, support probable cause to believe that registered users of Playpen intended to view and trade child pornography.5**

---

5 The two district judges who have reviewed the NIT in this case and made a probable cause determination both found that there was probable cause for the issuance of the NIT warrant, *See United States v. Darby*, No. 2:16cr36, 2016 WL 3189703 at *8 (E.D. Va. June 3, 2016); *United*

The NIT warrant affidavit amply supported a finding of probable cause.   The affiant, a 19-year FBI veteran with specialized training and experience in the field, set forth in detail why there was probable cause to believe anyone who logged into Playpen did so intending to view and/or trade child pornography.   Accordingly, his 31-page affidavit provided ample justification for deploying a NIT that would obtain seven discrete pieces of information and assist law enforcement in identifying those engaged in the sexual exploitation of children.

Here, the affiant's assessment—and the magistrate's reasonable reliance upon it—was supported by specific, articulable facts and inferences drawn from his training and experience. To begin, Playpen was no run-of-the-mill website that any internet user might just stumble upon. Rather, as a Tor hidden service, Playpen was accessible only to users who downloaded the necessary software and *knew* the precise algorithm-generated URL for Playpen.   Ex. A at 12, ¶ 10.   This is so, the affiant explained, because "Tor hidden services are not indexed like websites on the traditional Internet" and so, "unlike on the traditional Internet, a user may not simply perform a Google search for the name of one of the websites on Tor to obtain and click on a link to the site." *Id.*

Rather, "a user might obtain the web address directly from communicating with other users of the board, or from Internet postings describing the sort of content available on the website as well as the website's location."   *Id.*   Indeed, the affiant noted that there is a Tor "hidden service" page dedicated to pedophilia and child pornography that contained a section with links to Tor hidden services that contain child pornography, including Playpen.   *Id.* Given this, it was no great leap in logic for the magistrate to conclude that that a user who managed to find Playpen was aware of its purpose and content.

*United States v. Epich,* No. 15-CR-163-PP, slip. op. at 13 (E.D. Wis. Mar. 14, 2016).

The defendant disagrees and points to the search engine found at https://ahmia.fi as proof that the affiant's assessment about the difficulty in finding Playpen through a traditional search was incorrect.   Putting to one side that his bald assertion does nothing to undermine the conclusions of a veteran FBI agent relying on his experience and that of other experts, the defendant seemingly overlooks the search engine's "[c]ontent filtering policy" that states, "[w]e are removing each page which contains any child abuse from this search index" and provides a mechanism that users can report sites that contain child exploitation material.   *See* https://ahmia.fi (last visited April 1, 2016).

Then, of course, there is the site itself, which the magistrate reasonably could have concluded would have immediately alerted any user to the fact that it contained illicit images. Upon arrival at Playpen's homepage, the affiant explained, the user saw "to either side of the site name..., two images depicting partially clothed prepubescent females with their legs spread apart. Ex. A at 13, ¶ 12.   The images alone are a strong indicator of the presence of illicit child pornography.   But there was more—namely, written underneath those suggestive images of prepubescent girls were the instructions:   "[n]o cross-board reposts, .7z preferred, encrypt filenames, include preview."   *Id.*   While perhaps not obvious to the untrained eye, the affiant explained from his training and experience, he knew that "'no cross-board reposts'" refers to a prohibition against material that is posted on other websites from being 're-posted' to the website and '.7z' refers to a preferred method of compressing large files or sets of files for distribution." *Id.*   The suggestions that filenames be encrypted and that users include previews are obvious references to the sharing of image and video files.   And while such references, without more, do not compel the conclusion that the images and videos being shared are necessarily illicit, that was certainly a reasonable inference to draw, particularly given the other information available to the

magistrate.   Magistrates are required to be neutral, not devoid of common sense, when reviewing a warrant application.

The registration terms, to which any user who wished to log into Playpen had to agree, provide further support for the inference that Playpen's users were well aware of the its illicit purpose.   As detailed above, Playpen repeatedly warned prospective users about the risks of being identified.   Among other things, users were told, "the forum operators do NOT want you to enter a real [e-mail] address"; users "should not post information [in their profile] that can be used to identify [them]"; and "[t]his website is not able to see your IP."   Ex. A at 14-15, ¶ 13.   Again, without more, these warnings may have seemed innocuous.   Viewed in context, however, this focus on anonymity is entirely consistent with the desire on the part of Playpen users to avoid law enforcement detection.

Playpen's content is relevant too.   As the affiant noted, upon registration, all of the sections, fora, and sub-fora were at the user's fingertips.   Ex. A at 15, ¶ 14.   The vast majority were categorized repositories for sexually explicit images of children, sub-divided by gender and the age of the victims. *Id.* at 15-16, ¶ 14, n.5.   That none of the subsections are specifically focused on adults (other than perhaps the "Family Playpen – Incest" section) only reinforced the conclusion that users knew perfectly well Playpen's purpose.   The affiant described in graphic detail particular child pornography that was available to Playpen users, pornography that depicted prepubescent children and even toddlers being sexually abused by adults.   *Id.* at 17-18, ¶ 18.   The affiant offered a litany of site sub-fora that contained "the most egregious examples of child pornography" as well as "retellings of real world hands on sexual abuse of children." *Id.* at 20-21, ¶ 27.   He understandably concluded, and the magistrate reasonably found, "the entirety of [Playpen was] dedicated to child pornography."   *Id.*

Courts have routinely held that membership in a child pornography website, even without specific evidence of a suspect's downloading child pornography, provides sufficient probable cause for a search warrant.   This is so given the commonsense, reasonable inference that someone who has taken the affirmative steps to become a member of such a website would have accessed, received, or downloaded images from it.   *See United States v. Gourde,* 400 F.3d 1065, 1070 (9th Cir. 2006) (*en banc*) (finding sufficient probable cause for residential search where defendant paid for membership in a website that contained adult and child pornography; noting reasonable, commonsense inference that someone who paid for access for two months to a website that purveyed child pornography probably had viewed or downloaded such images onto his computer); *and see United States v. Martin*, 426 F.3d 68, 74-75 (2d Cir. 2005); *United States v. Shields*, 458 F.3d 269 (3d Cir. 2006) ; and *United States v. Froman*, 355 F.3d 882, 890–91 (5th Cir. 2004). *Also see United States v. Kearney*, 672 F.3d 81, 89-90 (1st Cir. 2012)(probable cause to search defendant's home because IP address assigned to home computer repeatedly accessed online accounts used to send child pornography).

In sum, "numerous affirmative steps" were required for a user to find and access Playpen, which made it "extremely unlikely that any user could simply stumble upon" the site "without understanding its purpose and content."   Ex. A at 12-13, ¶ 10.   That, combined with the information available on Playpen's homepage and registration terms, considered in light of the affiant's specialized training and experience, established that even in the unlikely event that someone did stumble upon Playpen, its illicit purpose would have been obvious.

In *United States v. Darby*, No. 2:16cr36, 2016 WL 3189703 (E.D. Va. June 3, 2016), a District Judge in the Eastern District of Virginia held in a case involving the same NIT warrant, "the magistrate judge would have been justified in concluding that those individuals who

registered and logged into Playpen had knowledge of its illegal content." *Darby*, 2016 WL 3189703 at * 8.

### B. Defendant's challenge to the magistrate's finding of probable cause utterly fails.

Nothing the defendant says in his motion casts doubt on the affiant's conclusions or the magistrate's finding of probable cause to deploy the NIT.   The defendant's primary argument relies on a fundamental misunderstanding of the bases for the magistrate's finding of probable cause.   Specifically, the defendant claims that, because—in his view—it is not readily apparent to a viewer of Playpen's homepage that the site is dedicated to child pornography, the NIT warrant must fail.   For several reasons, his analysis misses the mark.

First, the defendant's claim that Playpen's illicit purpose was not readily apparent reflects nothing more than his disagreement with the conclusions of a seasoned FBI agent applying his considerable training and experience to the objective, observable facts.   As detailed above, the sexually suggestive logo, the text that accompanied it, and the registration terms all reinforced the agent's conclusion that Playpen was no mere discussion forum or a space for users to exercise their First Amendment rights, as the defendant baldly asserts.   Rather, he concluded that Playpen was obviously a forum dedicated to the sharing of child pornography and child sexual exploitation.   Law enforcement officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."   *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (collecting cases).   In making probable cause determinations, magistrates may rely upon an experienced officer's conclusions as to the likelihood that evidence exists and where it is located.   *See United States v. Dancy*, 640 F.3d 455, 461 (1st Cir. 2011)(reasonable suspicion to stop supported by experience officer's assessment that defendant putting hand in

pocket was consistent with putting hand on gun).    The defendant is certainly free to disagree with the affiant's assessment, but his disagreement does not mean that the magistrate was compelled to do the same.

Second, that Playpen's illicit purpose was apparent was but one factor supporting the magistrate's probable cause determination.    As explained in the affidavit, Playpen was no ordinary website accessible to any ordinary internet user.    Access to Playpen required specialized software and knowledge of the algorithm-generated URL.    The defendant raises the specter of the unwary internet traveler who might happen upon Playpen and login with every intention of engaging in legal conduct.    But as the affiant explained, given the nature of Playpen and the "numerous affirmative steps" required to access it, such a scenario was exceedingly unlikely.    Ex. A at 12-13, ¶ 10.

## II.    Defendant has made no showing that justifies a *Franks* hearing, let alone established that the NIT warrant contained a material and intentional or reckless falsehood or omission.

When a *Franks* hearing is sought based on information omitted from an affidavit, the defendant must show: (1) that the omission is the product of a deliberate falsehood or of a reckless disregard for the truth, and (2) inclusion of the omitted information in the affidavit would defeat probable cause.    In addition to this substantial preliminary showing, a defendant must also demonstrate that the alleged falsity or omission was material to the probable cause determination.    *Franks*, 438 U.S. at 155-56.    *See United States v. Santana*, 342 F.3d 60, 66 (1st Cir. 2003)(wire-tap order valid even if defendant showed that including wrong number in affidavit was reckless because correct apartment number was not necessary to demonstrate probable cause).

In the seminal case, *Franks v. Delaware*, the Supreme Court stressed that there is a presumption of validity with respect to a search warrant affidavit.   438 U.S. at 155-56.   As such, under *Franks*, conclusory allegations of a defect will not do.   *Id.* at 171.   Defendants must offer allegations of intentional falsehood accompanied by an offer of proof.   Affidavits or sworn or otherwise reliable statements of witnesses should be furnished or their absence satisfactorily explained before a hearing is granted.   *Id.*   Allegations of negligence or innocent mistake are insufficient.   *Franks*, 438 U.S. at 171.   In *Franks* and subsequent cases, the Supreme Court was clear that the rule it had announced has "a limited scope," one that places a heavy burden on the defendant.   *Id.* at 169.   A defendant cannot meet that burden through a conclusory argument based on bare allegations that fail to make the requisite preliminary substantial showing.

Applying these principles, there can be little doubt that the defendant has not made anything resembling a substantial, preliminary showing of an intentional or reckless falsehood or omission.   First, his offer of proof hardly suffices.   He proffers no evidence that any omission of the administrator's change to the Playpen logo just before the NIT warrant was authorized was reckless, let alone intentional.   Nor could he.   After all, the affiant explained that he had reviewed Playpen on February 18, 2015, the day before the logo changed.   Ex. A at 14-15 n.3. The most that can be said is that, with the benefit of hindsight, it would have been better for the affiant to have reviewed Playpen the morning the warrant was signed, as opposed to two days before.   If a failing at all, a proposition with which the government disagrees,   it was – at worst - an unintentional oversight.   Indeed, it would be a stretch to characterize the agent as negligent; it certainly cannot be said he acted recklessly or with some intent to deceive.   And, "mere[ ]

negligen[ce] in... recording the facts relevant to a probable-cause determination" is not enough to warrant a *Franks* hearing.   *See Franks*, 438 U.S. at 170.

Just as important, even if that omission were intentional, it was utterly immaterial to the finding of probable cause.   The administrator's replacing *two* sexually suggestive images of prepubescent girls with *one* sexually suggestive image of a prepubescent girl is hardly the game changer that the defendant claims it to be.   As detailed above, the magistrate's probable cause finding rested on a host of facts and inferences resting on the affiant's specialized training and experience that demonstrated a "fair probability" that anyone who logged into Playpen did so intending to view and/or share child pornography.   The relevance of the image(s) in the Playpen logo was that it/they sexualized young girls.   That was true before February 19, *see* Ex. B, and it remained true after, *see* Ex. C.

Nor do the other purported misstatements the defendant identifies warrant a *Franks* hearing.   Indeed, much of what he characterizes as false statements reflect little more than his opinion about the weight the Court should attach to particular statements in the affidavit and the affiant's training and experience.   For example, the defendant takes issue with the affiant's claim that Playpen was "dedicated to child pornography;" disputes the significance of the affiant's description of the text contained underneath those suggestive images on the website's main page; and disagrees with the affiant's assessment that accessing Playpen required "numerous affirmative steps" that made it "extremely unlikely that any user could simple stumble upon" the site "without understanding its purpose and content."   The defendant's mere disagreement with the affiant's description of the facts or the inferences to be drawn from those facts in light of his training and experience, however, does not an omission or falsehood make.

The defendant is certainly free to contest whether the facts contained in the affidavit, considering the totality of the circumstances, supported probable cause—as he apparently does. He is not, however, entitled to a *Franks* hearing simply because he does not like the inferences drawn from those facts by the affiant.   And he certainly cannot convert his disagreement into a showing that the affidavit was somehow misleading just by declaring it so.   Nothing in *Franks* requires an affiant to "list every conceivable conclusion" and his failure to do so in no way "taint[s] the validity of the affidavit."   *United States v. Burnes,* 816 F.2d 1354, 1358 (9th Cir. 1987)) (internal quotation marks omitted).

Even so, beyond conclusory assertions that a particular statement is wrong*,* Defendant offers nothing that would suggest it constitutes an intentional or reckless falsehood.   "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine."   *Franks*, 438 U.S. at 171.   The defendant's remaining "*Franks*" arguments are exactly that: reflective of little more than his apparent desire to cross-examine the affiant.

In short, the sum total of the defendant's *Franks* argument seems little more than a recitation of his principal argument against the finding of probable cause: that is, it was theoretically possible that a user may have accessed Playpen without intent to view child pornography.   The affiant did not claim otherwise.   He merely concluded, based upon the available facts and his training and experience, that it was "extremely unlikely."   Ex. A at 12-13, ¶ 10.   More importantly, the magistrate agreed.

The Eastern District of Virginia recently denied a motion for a *Franks* hearings in a case with the same NIT warrant as the NIT warrant in the case now before the court.   *See Darby,* 2016 WL 3189703 at *9 ("Defendant has failed to make a substantial preliminary showing that the

inaccuracies regarding the Playpen homepage were made knowingly or with reckless disregard for the truth… [a]dditionally, a *Franks* hearing is not justified because the alleged falsity in the affidavit was not necessary to a finding of probable cause”).

### III.   The NIT warrant particularly described the locations to be searched and the things to be seized based on a showing of probable cause as to each.

The NIT warrant described the places to be searched—activating computers of users or administrators that logged into Playpen—and the things to be seized—the seven pieces of information obtained from those activating computers—with particularity.   And a neutral and detached judge found that there was probable cause to support the requested search.   The Fourth Amendment requires no more.   Accordingly, the Court should decline the defendant's invitation to read into the Fourth Amendment a heretofore undiscovered upper bound on the number of searches permitted by a showing of probable cause.

The constitutional principles at play here are well settled.   “[N]o warrants shall issue, but upon probable cause,...and particularly describing the place to be searched, and the persons or things to be seized.”   U.S. Const. amend. IV.   The Constitution demands that two things be described with particularity:   “the place to be searched’ and ‘the persons or things to be seized.” *United States v. Grubbs*, 547 U.S. 90, 97 (2006).   As to the place, it must be described with sufficient particularity “such that the officer with a search warrant can, with reasonable effort, ascertain and identify the place intended.”   *Steele v. United States,* 267 U.S. 498, 503 (1925) (internal quotation marks omitted).   As to the items seized, nothing must be “left to the discretion of the officer executing the warrant” in deciding what to seize.   *Marron v. United States*, 275 U.S. 192, 196 (1927).   *See United States v. Mousli*, 511 F.3d 7, 13 (1st  Cir. 2007)(warrant sufficiently particular despite not specifying which unit in a multi-unit building to be searched because officers

were unaware building contained multiple units and defendant had previously given home address without providing unit number).   Whether this particularity standard is met is determined in light of the information available at the time the warrant issued.

The Fourth Amendment also places limits on the scope of a search.   "[T]he scope of a lawful search 'is defined by the object of the search and the places in which there is probable cause to believe that it may be found.'"   *Maryland v. Garrison*, 480 U.S. 79, 84 (1987) (quoting *United States v. Ross*, 456 U.S. 798, 824 (1982)).   Under this principle, "[a] lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search."   *United States v. Ross*, 456 U.S. 798, 820-21 (plurality opinion).   Thus, for purposes of the Fourth Amendment, determining the proper scope of a search depends on the relationship between the items to be seized under the warrant and the likelihood that they will be found in the places to be searched.

Plainly, the NIT warrant meets both particularity requirements.   Attachments A and B of the NIT warrant were, respectively, identified the "Place to be Searched" and the "Information to be Seized."   Both defined with precision where agents could look and for what.   Attachment A of the warrant authorized deployment of the NIT to the computer server hosting Playpen and then to computers of "any user or administrator who logs into [Playpen] by entering a username and password."   Ex. A, Att. A.   Attachment B, in turn, imposed precise limits on what information could be obtained from those computers by the NIT:

1) the computer's actual IP address and the date and time that the NIT determines what that IP address is;

2) a unique identifier generated by the NIT to distinguish data from that of other computers;

28

3) the type of operating system running on the computer;

4) information about whether the NIT has already been delivered to the "activating" computer;

5) the computer's Host Name;

6) the computer's active operating system username; and

7) the computer's media access control ("MAC") address.

*Id.*, Att. B.

Tellingly, the defendant does not claim that the locations to be searched were not readily identifiable from the face of the warrant or that the warrant somehow left the decision of what should be seized open to debate. Nor does he claim that there is any doubt that the items authorized to be seized were not reasonably likely to be found in the places to be searched. Rather, he presses a novel constitutional rule for the Internet age: the NIT warrant is an unconstitutional "general warrant" because it authorized, upon finding of probable cause, the collection of specific information from a potentially large number of computers. If he is right, then hidden within the Fourth Amendment is a previously undiscovered upper bound on the number of search locations a showing of probable cause can support.

To be sure, the Fourth Amendment demands that there be probable cause to search a particular location for particular items. But the notion that a warrant supported by sufficient probable cause to authorize a search of numerous locations is, for that reason alone, constitutionally defective is absurd. Either probable causes *exists* to support a search or searches or it *does not*. Here, of course, the defendant maintains that the NIT warrant, which permitted the collection of information from any user or administrator who logged into Playpen, was not supported by sufficient facts to justify the search. As explained above, however, he is incorrect. There was a *fair probability* that anyone who logged into Playpen did so with knowledge of its

content and the intent to consume it.   Accordingly, the warrant properly authorized the deployment of the NIT to any such user, regardless of how many there are or could be.

Defendant's effort to cast the NIT warrant as authorizing a sweeping electronic search of personal data strains credulity.   The limited scope of the NIT warrant's authorized search is certainly relevant in assessing its reasonableness and the magistrate's determination.   The NIT warrant did not subject Defendant to a wholesale search of his electronic devices.   Rather, the NIT collected seven pieces of information that would assist law enforcement in identifying those suspected of trading and viewing child pornography.

Indeed, the most critical piece of information obtained by the NIT warrant—Defendant's IP address—is information that ordinarily would have been publicly available over which the defendant cannot claim a reasonable expectation of privacy.   *In re § 2703(d)*, 787 F. Supp. 2d 430, 438-440 (E.D. Va. Mar. 11, 2011) (holding that petitioners "have no Fourth Amendment privacy interest in their IP addresses" because, "like a phone number, an IP address is a unique identifier assigned through a service provider" that "corresponds to an internet user's individual computer," one that can be "voluntarily conveyed... thus exposing the information to a third party administrator, and thereby relinquishing any reasonable expectation of privacy" (internal citations omitted)); *see also United States v. Suing*, 72 F.3d 1209, 1213 (8th Cir. 2013) (defendant "had no expectation of privacy in [the] government's acquisition of his subscriber information, including his IP address and name from third-party service providers"); *United States v. Christie*, 624 F.3d 558, 573-74 (3d Cir. 2010) ("[N]o reasonable expectation of privacy exists in an IP address, because that information is also conveyed to and, indeed, from third parties, including [Internet Service Providers]."); *United States v. Forrester*, 512 F.3d 500 (9th Cir. 2007) (Internet users have no expectation of privacy in the IP addresses of the websites they visit).   Importantly, those courts

who have considered the question have expressly concluded that the use of the Tor network does not change the result. *United States v. Michaud*, No. 3:15-cr05351-RJB, 2016 WL 337263, at *7 (W.D. Wa. Jan. 28, 2016) (concluding that a Playpen user "has no reasonable expectation of privacy in the most significant information gathered by deployment of the NIT, [his] assigned IP address," because even though "the IP addresses of users utilizing the Tor network may not be known to websites, like [Playpen], using the Tor network does not strip users of all anonymity, because users accessing [Playpen] must still send and receive information, including IP addresses, through another computer, such as an Internet Service Provider, at a specific location"); *United States v. Farrell*, No. CR15-029RAJ, 2016 WL 705197, at *2 (W.D. Wash. Feb. 23, 2016) (considering the question as applied to the administrator of a site on the Tor network through which illicit substances were distributed and concluding that users of the network "must disclose information, including their IP addresses, to unknown individuals running Tor nodes, so that their communications can be directed toward their destinations," and that "[u]nder th[o]se circumstances Tor users clearly lack a reasonable expectation of privacy in their IP addresses while using the Tor network"); *see also* 811 F.3d 275, 278 (8th Cir. 2016) ("An Internet Service Provider (ISP) assigns an IP address to an individual computer using its Internet service and associates the IP address with the physical address to which that service is being provided."). *United States v. Stamper,* No. 1:15cr190, slip op. at 22 (S.D. Ohio February 19, 2016), ECF No. 48.

In short, the defendant's novel rule, which he cloaks in the language of particularity and overbreadth as if to conceal its lack of constitutional foundation, cannot defeat a validly obtained warrant, supported by probable cause, that particularly describes where to search and for what.

That a warrant authorizes the search of a potentially large number of suspects is an indication, not of constitutional infirmity, but a large number of criminal suspects.

Three district judges, who have reviewed whether the NIT warrant in this case constitutes an unconstitutional general warrant, have uniformly held that it does not.   *See Michaud*, slip op. at 10 ("Both the particularity and breadth of the NIT Warrant support the conclusion that the NIT Warrant did not lack specificity and was not a general warrant'); *see United States v. Epich,* No. 15-CR-163-PP, slip. op. at 19 (E.D. Wis. Mar. 14, 2016) ("[T]he NIT Warrant satisfied the Fourth Amendment's particularity requirement as it specifically described the place to be searched and things to be seized.") *and see Darby*, 2016 WL 3189703 at *8 ("The NIT Warrant describes particular places to be searched – computers that have logged into Playpen – for which there was probable cause to search.   It is not a general warrant.").

## IV.   Defendant's claim that the warrant is void because the "triggering event" never occurred also fails.

Defendant's claim that the NIT warrant was void because, as an anticipatory warrant, the "triggering event" never occurred is little more than a rehash of the same probable cause and *Franks* challenges that have already been addressed.   Although Defendant does not appear to challenge the notion that the NIT warrant could be categorized as an anticipatory warrant, he wrongly asserts that it was void because the "triggering event" that would authorize its execution against him never occurred.

It is well settled that the Fourth Amendment is no bar to "anticipatory warrants."   These warrants are "no different in principle from ordinary warrants."   *United States v. Grubbs*, 547 U.S. 90, 96-97 (2006).

> [T]wo prerequisites of probability must be satisfied.   It must be true not only that if the triggering condition occurs "there is a fair probability that contraband or evidence of a

crime will be found in a particular place," but also that there is probable cause to believe that the triggering condition will occur.

*Id.* (quoting *Gates*, 462 U.S. at 238).

Here, the relevant "triggering event" was the defendant's decision to enter his username and password into Playpen and enter the site.   (Although, as was the case with many other users, the NIT was not deployed to the defendant immediately upon login but only once he accessed a particular section of the site.)   And here, too, the NIT warrant affidavit provided ample support for the probable cause determination as to both.   Attachments A and B, which were incorporated into the warrant, specified the exact conditions under which the NIT was authorized to be deployed—*i.e.*, when a user such as the defendant logged into Playpen—and as discussed in detail above, there was probable cause to believe that any user who logged on to Playpen was seeking child pornography.

The defendant posits that because the "triggering event" never occurred because the defendant did not log into Playpen through the login page, as it was described in the NIT warrant affidavit, based on the change to the Playpen logo.   Because the login page reflected this single change, the defendant asserts that the NIT warrant was void.   Notably, he is not claiming that he did not, in fact, log into Playpen.   Instead, the defendant's argument on this point is just a recitation of his probable cause and *Franks* challenges.   As noted above, there was ample support for the magistrate's finding of probable cause, and the defendant utterly fails in his effort to make out a *Franks* challenge to the warrant.   Accordingly, his claim about the absence of a "triggering event" to support execution of the NIT warrant must also fail.

A judge in the Eastern District of Virginia who examined the triggering event issue with regard to the NIT warrant in this case, held that the triggering event occurred.   *See Darby*, 2016

33

WL 3189703 at *8 ("Logging into Playpen was the triggering event, and all computers searched under the NIT Warrant, including Defendant's, logged into the site.").

**V.     None of Defendant's claimed defects in the NIT warrant justify the extraordinary remedy of suppression and, even if that warrant does not satisfy the Fourth Amendment, the good faith exception bars suppression.**

As a threshold matter, Defendant's dissatisfaction with having been discovered through the NIT is understandable.   But the mere fact that he objects to having been unmasked, without more, does not warrant suppression of evidence obtained pursuant to a warrant issued by a neutral and detached magistrate based on a finding of probable cause.   For all of the reasons outlined above, the NIT warrant does not contravene the requirements of the Fourth Amendment.   But even if it did, suppression of the information derived from the execution of that warrant is not appropriate.

The Fourth Amendment's exclusionary rule does not provide "a personal constitutional right, nor is it designed to redress the injury occasioned by an unconstitutional search." *Davis v. United States*, 564 U.S. 229, 236 (2011) (quoting *Stone v. Powell*, 428 U.S. 465, 468 (1976)) (internal quotation marks omitted).   The exclusionary "rule's sole purpose … is to deter future Fourth Amendment violations."   *Davis*, 564 U.S at 236 (collecting cases).   The real deterrent value "is a 'necessary condition for exclusion,' but it is not a 'sufficient' one."   *Id.* (quoting *Hudson v. Michigan*, 547 U.S. 586, 596 (2006)).   There are substantial costs associated with its application.   *Id.*   ("Exclusion exacts a heavy toll on both the judicial system and society at large…It almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence.").   The practical effect in nearly every case "is to suppress the truth and set the criminal loose in the community without punishment."   *Id.* (citing *Herring v. United States*, 555 U.S. 135, 141 (2009).   Accordingly, it is to be employed "only as a 'last resort'"—that is, when "the deterrence benefits of suppression … outweigh its heavy costs."   *Id.* (quoting *Hudson*, 547

U.S. at 591);    "Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield meaningful deterrence, and culpable enough to be worth the price paid by the justice system."   *Davis*, 564 U.S at 240.

In *United States v. Leon*, 468 U.S. 897, 905 (1984), the police obtained evidence pursuant to a search warrant they believed to be valid, but it was later found to be defective for a lack of probable cause.   Nevertheless, the Supreme Court held that the evidence admissible because the officers had reasonably relied on the magistrate's determination that the warrant was supported by probable cause.   The Court created the "good faith" exception to the exclusionary rule because suppressing evidence obtained pursuant to a warrant.   *Id.* at 918-19.   The good faith exception also applies when the police obtain evidence in reliance on a warrant later found to be technically defective.   *See Massachusetts v. Sheppard*, 468 U.S. 981, 991 (1984).   This objective standard is measured by "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."   *Leon*, at 922, n.23.   "[A] warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search."   *Id.* at 922 (internal quotation marks omitted).   *See United States v. Tiem Trinh*, 665 F.3d 1, 16 n.5 (1st Cir. 2011)(good faith exception applies despite warrant's lack of particularity because affidavit supporting warrant specified evidence sought and officers searched for that specified evidence).

The Supreme Court observed that "suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule."   *Id.* at 918.   The Court identified only four circumstances in which exclusion of evidence seized pursuant to a warrant is appropriate.   Those are when: (1) the issuing magistrate was misled by the inclusion of knowing or recklessly false

information; (2) the issuing magistrate wholly abandoned the detached and neutral judicial role; (3) the warrant is facially deficient as to its description of the place to be searched or the things to be seized; or (4) the affidavit upon which the warrant is based is so lacking in indicia of probable cause that no reasonable officer could rely on it in good faith.   *Id.* at 923-924.   None apply here.

Here, the NIT warrant affidavit contained no knowingly or recklessly false information that was material to the issue of probable cause.   Nor does the defendant allege that the issuing magistrate abandoned her judicial role.   The warrant clearly and particularly described the locations to be searched and the items to be seized.   And the affidavit made a strong, comprehensive showing of probable cause to deploy the NIT.   Absent any of these errors, once the magistrate signed the warrant, having been made aware of how the NIT would be implemented and its reach, the agents' reliance on that authority was objectively reasonable. *See Massachusetts v. Sheppard*, 468 U.S. 981, 989-90 (1984) ("[W]e refuse to rule that an officer is required to disbelieve a judge who has just advised him, by word and by action, that the warrant he possesses authorizes him to conduct the search he has requested.").   Ultimately, agents acted reasonably and in good faith in relying on the magistrate's authorization of the NIT warrant, and so the evidence seized pursuant to it should not be suppressed.

Five district court judges around the country who have reviewed the NIT at issue in this case have found that the *Leon* good faith exception to the exclusionary rule applies to actions of the police in this case.   *See United States v. Michaud*, No. 3:15-cr05351-RJB, 2016 WL 337263, at *7 (W.D. Wa. Jan. 28, 2016). ("Because reliance on the NIT Warrant was objectively reasonable, the officers executing the warrant acted in good faith, and suppression is unwarranted"); *United States v. Stamper*, No. 1:15cr190, slip op. at 21 (S.D. Ohio February 19, 2016), ECF No. 48 ("[T]he *Leon* good faith exception allows admission of the evidence seized as

36

a result of the NIT"); *United States v. Werdene*, No. 2:15cr434, 2016 WL 3002376, §V, Pt. D, ¶ 9, slip. op. at 32 (E.D. Pa. May 19, 2016) (in applying the good faith exception, the district judge noted "Exclusion of the evidence in this case would only serve to 'punish the errors of judges and magistrates' and would not have any 'appreciable' effect on law enforcement;" *Darby*, 2016 WL 3189703 at *13 ("The FBI agents in this case did the right thing… [t]he FBI should be applauded for its actions in this case.").

## VI.     The Magistrate Judge in the Eastern District of Virginia had jurisdiction to issue the NIT warrant.

Defendant argues that (1) the magistrate judge in the Eastern District of Virginia lacked jurisdiction to authorize the NIT warrant because that warrant allegedly exceeded territorial limits placed on the geographic areas in which a magistrate judge has jurisdiction to issue warrants; and (2) that the issuance of the NIT warrant violated Rule 41 of the Federal Rules of Criminal Procedure.   He contends that suppression of the information transmitted by the NIT is appropriate based on these alleged violations.   The defendant is wrong on both points and suppression is not warranted.

### A.     The Issuance of the NIT Warrant was Lawful

The 31-page NIT warrant affidavit amply articulated - and the magistrate judge found - probable cause to deploy the NIT to registered users of a website dedicated to the advertisement and distribution of child pornography that operated on the anonymous Tor network.   The warrant particularly described exactly what information would be collected through the NIT—seven discrete items of identifying information—and how that information would assist with identifying Playpen users and administrators.   In so doing, it comprehensively established

a fair probability that evidence of a crime would be found through the issuance and execution of the warrant.   Moreover, the NIT warrant was issued by a magistrate judge within the jurisdiction of the District in which the website operated during the period of authorization and, accordingly, the District into which registered site users reached when accessing the website.

**B.     The Issuance of the NIT Warrant Does Not Violate the Federal Magistrates Act**

The issuance of the NIT warrant comported with the Federal Magistrates Act (28 U.S.C. § 636).   The plain language of § 636(a) vests a United States magistrate judge with certain powers and duties, including those "conferred or imposed . . . by the Rules of Criminal Procedure for the United States District Courts."   28 U.S.C. § 636(a)(1).   Under the Federal Magistrates Act, a magistrate judge "shall have" such powers "within the district in which sessions are held by the court that appointed the magistrate judge, at other places where that court may function, and elsewhere as authorized by law."   28 U.S.C. § 636(a).   The prepositional phrase beginning "within the district" modifies the verb "shall have," which immediately proceeds that phrase—not the enumerated powers that follow it.   Thus, Section 636(a) limits where a magistrate judge may possess such powers, but not necessarily where those powers can have effects.   In the warrant context, this means that the warrant must issue from a district described in § 636(a)—for example, the district in which a magistrate judge sits—but not that the warrant's effects must be limited to that district.

Defendant's mistaken assumption is that a magistrate judge cannot possess a power that has effects beyond the places described in § 636(a).   Indeed, even a cursory review of Rule 41(b) makes clear that the narrow reading of § 636(a) Defendant urges is inapposite.   For example, Rule 41(b)(2) expressly provides that "a magistrate judge with authority in the district

has authority to issue a warrant for a person or property outside the district[.]"    Fed. R. Crim. P. 41(b)(2).    Although Rule 41(b)(2) requires that such person or property must be "located within the district when the warrant is issued," it nevertheless shows that a magistrate judge can exercise power with precisely the same out-of-district effects—namely, a search or seizure—that Defendant asserts contravene the territorial jurisdiction provided her by § 636(a).    *Id.*    Indeed, nearly every provision of Rule 41(b) underscores the absurdity of the jurisdictional limits the defendant proposes. Save Rule 41(b)(1), all authorize the issuance of warrants for either persons, property, or both with potential or explicit out-of-district effects.    For example, Rule 41(b)(3) authorizes a magistrate judge "in any district in which activities related to . . . terrorism may have occurred . . . to issue a warrant for a person or property within or outside that district."    Fed. R. Crim. P. 41(b)(3).    Rule 41(b)(4) allows a magistrate judge "to issue a warrant to install within the district a tracking device" that can be used "to track the movement of a person or property located within the district, outside the district, or both."    Fed. R. Crim. P. 41(b)(4).    And Rule 41(b)(5) authorizes a magistrate judge "in any district where activities related to the crime may have occurred" or—without any showing that activities related to the crime might have occurred in that district—a magistrate judge in the District of Columbia to "issue a warrant for property that is located outside the jurisdiction of any state or district but within" a number of other places, including any "United States territory, possession, or commonwealth."    Fed. R. Crim. P. 41(b)(5).    Thus, unless all of the provisions are unlawful, 28 U.S.C. § 636 does not impose the territorial restriction that Defendant claims.

### C.     The Issuance of the NIT Warrant Does Not Violate Rule 41

Rule 41(b) is flexible enough to allow the issuance of warrants to investigate Tor hidden

services.   *See United States v. New York Telephone Co.*, 434 U.S. 159, 169 & n.16 (1977).    In

fact, three separate provisions support the issuance of the NIT warrant.

First, Rule 41(b)(4) allows a magistrate judge "to issue a warrant to install within the

district a tracking device."   Fed. R. Crim. P. 41(b)(4).    Such a "warrant may authorize use of

the device to track the movement of a person or property located within the district, outside the

district, or both."   Id.    A "tracking device" is defined as "an electronic or mechanical device

which permits the tracking of the movement of a person or object." Fed. R. Crim. P. 41(a)(2)(E);

18 U.S.C. § 3117(b).    In a physical tracking device case, investigators might obtain a warrant to

install a tracking device in a container holding contraband, and investigators might then

determine the location of the container after the targets of the investigation carry the container

outside the district.    See *United States v. Knotts*, 460 U.S. 276, 285 (1983) (upholding against a

Fourth Amendment challenge the use of a "beeper" that had been placed in a container of

chloroform, allowing law enforcement to monitor the location of the container); *United States v.*

*Karo*, 468 U.S. 705, 712 (1984) (upholding the installation of a beeper in a container belonging

to a third party, holding that the defendant accepted the container as it came to him and was not

entitled to object to the beeper's presence even though it was used to monitor the container's

location); *United States v. Jones*, 565 U.S. ___, 132 S. Ct. 945, 952-53 (2012) (requiring a search

warrant for the installation of an information-gathering device to property belonging to a

defendant).

In this case, the NIT functioned in a similar manner in the context of the Internet.    After

obtaining a warrant from a neutral and detached magistrate judge sitting in the Eastern District of

Virginia, investigators augmented the illicit content of the Playpen site—hosted on a computer server located in that same district—with additional computer instructions comprising the NIT. When Defendant logged in to Playpen by entering his username and password and retrieved information from that server, he affirmatively retrieved both the illicit content and the NIT. Once downloaded, the NIT sent law enforcement information concerning the computer on which it and the illicit content were located. Investigators used this information to identify and locate the defendant.    Thus, Rule 41(b)(4) provided sufficient authority to issue the NIT warrant regardless of the location of the user or his computer.

Second, Rule 41(b)(2) allows a magistrate judge "to issue a warrant for a person or property outside the district if the person or property is located within the district when the warrant is issued but might move or be moved outside the district before the warrant is executed."    Fed. R. Crim. P. 41(b)(2).    Here, the warrant authorized use of the NIT (a set of computer instructions) located on a server in the Eastern District of Virginia when the warrant was issued.    As Rule 41(a)(2)(A) defines "property" to include both "tangible objects" and "information," the NIT constituted property within the District from which the warrant issued. Moreover, the NIT was only retrieved by registered users of Playpen who logged into the website, located within the Eastern District of Virginia, with a username and password.    Each of those users—including the defendant—accordingly reached into this District's jurisdiction to access the site (and the child pornography therein augmented with the NIT).    Thus, Rule 41(b)(2) also provided sufficient authority to issue the warrant for use of the NIT regardless of the location of Playpen users and their computers.    The possibility that such property or information "might move or be moved outside the district before the warrant [wa]s executed" is

41

expressly provided for by the Rule. Accordingly, Rule 41(b)(2) provides a second, independent

basis supporting the issuance of the NIT warrant.

Finally, the NIT warrant was issued by a magistrate judge in the district with the

strongest known connection to the search: all Playpen users entered this District by accessing the

Playpen server here, retrieved content from that server that included illicit images of child

pornography (augmented with computer instructions comprising the NIT), and the NIT sent

limited information back to a server in that district.   The magistrate judge had authority under

Rule 41(b)(1) to authorize a search warrant for "property located within the district."   The use

of the Tor hidden service by the defendant and other Playpen users made it impossible for

investigators to know in what other districts, if any, the execution of the warrant would take

place.   In these circumstances, it was reasonable for the Eastern District of Virginia magistrate

judge to issue the warrant.   Interpreting Rule 41 to allow the issuance of warrants like the NIT

does not risk significant abuse, because, as with all warrants, the manner of execution "is subject

to later judicial review as to its reasonableness."   *Dalia v. United States,* 441 U.S. 238, 258

(1979).   Indeed, for the reasons outlined above, the NIT warrant certainly complied with Rule

41(b)(1) as applied to this defendant. Accordingly, this Court should conclude that the issuance

of the warrant did not violate Rule 41.

Even if the defendant could show that Rule 41 did not expressly authorize the search and

seizure contemplated by the NIT warrant and accompanying affidavit, the Court is not limited to

such a narrow reading of that Rule.   Indeed, courts have long read Rule 41 broadly, interpreting

it to permit searches where they are consistent with the Fourth Amendment, even in cases

involving searches are not explicitly authorized by the text of the Rule.   In *United States v. New

York Telephone Co.*, for example, the Supreme Court upheld a 20-day search warrant for a pen

register to collect dialed telephone number information, despite the fact that Rule 41's definition of "property" at the time did not include information and the fact that Rule 41 required that a search be conducted within 10 days.    434 U.S. 159, 169 & n.16 (1977).    The Court explained that Rule 41 "is sufficiently flexible to include within its scope electronic intrusions authorized upon a finding of probable cause," and noted that this flexible reading was bolstered by Rule 57(b), which provides, "[i]f no procedure is specifically prescribed by rule, the court may proceed in any lawful manner not inconsistent with these rules or with any applicable statute." *Id.* at 169-70 (emphasis added).

Several Circuits have similarly construed Rule 41 broadly to allow warrants not explicitly authorized by the plain language of the Rule.    For example, in *United States v. Koyomejian*, the Ninth Circuit interpreted Rule 41 broadly to allow prospective warrants for video surveillance, despite the absence of provisions in Rule 41 explicitly authorizing or governing such warrants. 970 F.2d 536, 542 (9th Cir. 1992).

### D.    The NIT Warrant was Reasonable Under the Fourth Amendment

The NIT warrant falls with the broad and flexible provisions of Rule 41, both as a general matter and with respect to Defendant, specifically.    A detached and neutral magistrate judge, appropriately exercising her authority under the Federal Magistrates Act, found probable cause to support the use of the NIT to identify Playpen users and administrators.    The warrant particularly described the places to be searched and the limited information to be seized.    In doing so, it comprehensively established a fair probability that evidence of a crime would be found through its execution.    Defendant makes much of his strained readings of both § 636(a) and Rule 41, arguing that they support the conclusion that the magistrate judge acted beyond her authority and, therefore, her jurisdiction when she authorized the NIT warrant, rendering that

warrant void and, therefore, "no warrant at all."   Even if the defendant were correct, that would not end the inquiry because a warrantless search does not amount to a per se Fourth Amendment violation, without exception.   Instead, the question is whether the use of the NIT was nevertheless reasonable under the Fourth Amendment.   In this context, it undoubtedly was.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."   U.S. Const. Amend. IV.   The ultimate touchstone of the Fourth Amendment is reasonableness.   *Riley v. California*, 573 U.S. ___ , 134 S. Ct. 2473, 2482 (2014).   When law enforcement officials undertake a search to discover evidence of criminal wrongdoing, reasonableness generally requires them to obtain a judicial warrant.   *Id.*   The Supreme Court has recognized that the presumption that a warrantless search is unreasonable "may be overcome in some circumstances because '[t]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'"   *Kentucky v. King,* 2011563 U.S. 452, 460 (2011). "One well-recognized exception applies when the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment."   *Id.*   (internal quotation marks omitted). Courts must evaluate "the totality of the circumstances" to determine whether exigencies justified a warrantless search.   *Missouri v. McNeely*, 567 U.S. ___, 133 S. Ct. 1552, 1559 (2013).

Here, even if the government could not obtain a warrant for use of the NIT that complied with the letter of Rule 41(b), ample exigent circumstances existed to justify its use.   Playpen enabled ongoing sexual abuse and exploitation of children, and deploying the NIT against Playpen users was necessary to stop the abuse and exploitation and to identify and apprehend abusers.   Such abuse and exploitation included both the online sexual exploitation of children

through the distribution and receipt of child pornography and the ongoing abuse of live victims

by "hands on" offenders. For example, undercover reviews of postings related to the use of

Playpen's private messages or PMs revealed discussions of such abuse.

As of early January 2016, use of the NIT in this investigation had led to the identification

or recovery from abuse of twenty-six child victims.   Resp. to Order Compelling Discovery, No.

3:15-cr05351-RJB, 2016 WL 337263, at 4-5 (W.D. Wa. Jan. 28, 2016).   The FBI has also

identified at least thirty-five individuals who have been determined to be "hands on" child sexual

offenders, and seventeen individuals who have been determined to be producers of child

pornography.   *Id.*   *See United States v. Infante*, 701 F.3d 386, 393-94 (1st Cir. 2012)(exigent

circumstances justified firefighters' warrantless entry into residence and cellar search because

firefighters believed there was a danger of a secondary explosion inside residence, and trail of

blood led them to cellar, the potential source of the explosion).

The information the NIT collected was also fleeting.   If law enforcement had not

collected IP address information at the time of user communications with Playpen, then, due to

the site's use of Tor, law enforcement would have been unable to collect identifying information.

Absent the FBI's brief assumption of administrative control and use of the NIT to obtain that

information, "the identities of the administrators and users of [Playpen] would [have] remain[ed]

unknown" due to the location and operation of Playpen on the anonymizing Tor network.

Accordingly, if the warrant could not have been issued, then no warrant could have been

obtained in a reasonable amount of time to identify perpetrators.   See *United States v.*

*Struckman*, 603 F.3d 731, 738 (9th Cir. 2010) (stating that to invoke the exigent circumstances

exception, "the government must . . . show that a warrant could not have been obtained in time").

Moreover, the NIT warrant was minimally invasive and specifically targeted at the fleeting identifying information: it only authorized collection of IP address information and other basic identifiers for site users.   Defendant does not have a reasonable expectation of privacy in his IP address.   Before proceeding with a more invasive entry and search of Defendant's home and electronic devices, the government obtained a second Rule 41 warrant.

In sum, the NIT warrant provided authority for use of the NIT, and it is certainly preferable that the government obtain warrants (as it did here) to investigate large criminal enterprises such as Playpen.   Criminals' use of anonymizing technologies such as Tor to perpetuate crimes should not place them beyond the reach of law enforcement (or courts).   But even if no court had authority to issue a warrant to use a NIT to investigate Playpen users outside the Eastern District of Virginia, as Defendant essentially argues, its use was nonetheless reasonable under the Fourth Amendment.

E.   **The Issuance and Execution of the NIT Warrant did not Violate the Fourth Amendment**

None of the bases that the defendant argues warrant suppression withstand scrutiny. First, there was no violation of constitutional magnitude. The defendant wrongly claims that jurisdictional flaws and other fundamental violations of non-ministerial requirements necessarily involved matters of constitutional magnitude.   He is wrong.   For all the reasons set forth above, the magistrate judge's authorization of the NIT warrant did not exceed the authority vested in her by the Federal Magistrates Act.   Nor did it contravene either the text or the spirit of Rule 41.

As important, the search and seizure here complied with the Fourth Amendment. The Fourth Amendment demands three things of a search warrant: a warrant must be issued by a

neutral magistrate; it must be based on a showing of "probable cause to believe that the evidence sought will aid in a particular apprehension or conviction for a particular offense"; and it must satisfy the particularity requirement."   *Dalia*, 441 U.S. at 255; *see also Jones*, 822 F.2d 55, at 2 (rejecting district court's conclusion that a Rule 41 violation was constitutional when "[a]ll of the fourth amendment's required protections were afforded . . . in th[e] case").   As detailed above and, the NIT warrant easily meets these requirements.

The government's actions here were also reasonable under the circumstances.   Law enforcement has a substantial interest in identifying users of a massive website trafficking in child pornography and furthering the sexual abuse of children.   The court-authorized use of the NIT was necessitated by the Tor-based technology that the defendant and other offenders under investigation used to exploit children, which made it impossible for investigators to know where he was located without first using the NIT.   The individual privacy interests here were extremely limited, due to the minimally invasive nature of the NIT search and its focus on IP address information over which the defendant lacks a reasonable expectation of privacy.   Courts must balance the need for the search against any invasion of individual rights.   *Riley*, 573 U.S. ___,134 S. Ct. at 2484 .   The very fact the government sought and obtained a warrant from a neutral magistrate protected the defendant from an unreasonable search and seizure in violation of his constitutional rights.   Obtaining that warrant from a magistrate judge in the district where the website was hosted and where users, like the defendant, actively retrieved the site's content was eminently reasonable, particularly given the lack of available options.

As previously argued, even if the NIT warrant does not satisfy the Fourth Amendment, the good faith exception bars suppression here.   The NIT warrant affidavit contained no knowingly or recklessly false information that was material to the issue of probable cause.   The

issuing magistrate judge did not abandon her judicial role.    The warrant clearly and particularly

described the locations to be searched and the items to be seized.    The affidavit made a strong,

comprehensive showing of probable cause to use the NIT.    Therefore, the agents' reliance on

the magistrate judge's authority to issue the warrant was objectively reasonable.

### F.    Defendant's Reliance on the <u>Levin</u> Ruling is Misplaced.

Defendant asks this Court to adopt the reasoning and holding of *United States v. Levin*,

No. 15-10271-WGY, 2016 WL 2596010 (D. Mass. May 5, 2016) on the issue of a potential Rule

41(b) violation.    In his decision suppressing evidence derived from the same NIT at issue in this

case, Judge Young held that the magistrate judge in the Eastern District of Virginia violated Rule

41 and the Federal Magistrates Act by issuing a NIT warrant that would be executed outside of

the Eastern District of Virginia.    Judge Young held, in pertinent part, that: (1) the NIT warrant

constituted a "substantive" or constitutional violation of Rule 41(b) in that it infringed on

Defendant's Fourth Amendment rights, and (2) that the good faith exception was not available in

this context, i.e. where a magistrate judge issues a warrant without proper jurisdiction, because

the NIT warrant was void *ab initio*.

### A.    The NIT Warrant was not void ab initio.

Judge Young's threshold determination that the NIT warrant was void from the outset

because the magistrate judge was without authority to issue it is incorrect. First, even assuming

that Rule 41 did not permit the magistrate judge to issue a warrant for the search of activating

computers located in other federal districts, the warrant was not wholly void, for Rule 41 plainly

authorized the magistrate judge to issue the NIT Warrant for the search of activating computers

located within the Eastern District of Virginia and within a territory, possession, or

commonwealth of the United States and diplomatic or consular premises and residences of the

United States located in foreign states. See Fed. R. Crim. P. 41(b)(1) and (5). Second, the Rule 41 violation that Judge Young found to have occurred in this case—essentially, that the government obtained authorization for the NIT Warrant from the wrong judge—does not implicate the Fourth Amendment and therefore does not render the warrant utterly void without regard to whether the defendant suffered prejudice. For both of these reasons, Judge Young's finding that the NIT Warrant was void ab initio must be rejected.

### A.      The magistrate judge was not without authority to issue the NIT Warrant.

Contrary to Judge Young's finding, the magistrate judge was not wholly without authority to approve the NIT warrant.   Rather, Rule 41 at a minimum permitted the magistrate judge to issue the NIT warrant for the search of activating computers located within the Eastern District of Virginia and within the territorial and diplomatic areas listed in subsection (b)(1)(5) of Rule 41.   Since the magistrate judge acted within her authority to approve the search warrant for these locations, it cannot be said that "there simply was no judicial approval" for the warrant. *Levin,* at page18.

Under these circumstances, the magistrate judge was clearly authorized pursuant to §636(a)(1) and Rule 41(b)(1) and (5) to issue the NIT Warrant, which satisfied the Fourth Amendment's probable cause and particularity requirements, for the search of activating computers in the Eastern District of Virginia and United States' territories and diplomatic locations.   Since the magistrate judge was permitted by statute and rule to issue the NIT Warrant for searches within her jurisdiction, Judge Young's finding that she had no authority to issue the warrant is unsound.   That the NIT Warrant could have been and was used to search computers in the Eastern District of Virginia validly distinguishes this case from *United States v. Krueger,* 809 F.3d 1109 (10th Cir. 2015), and *United States v. Glover*, 736 F.3d 509 (D.C. Cir.

2013), which Judge Young relied upon to find the NIT Warrant void *ab initio*. In both *Krueger* and *Glover*, the warrant applications presented to the judge for approval made clear that the place to be searched was not within the authorizing judge's district. *Krueger,* 809 F.3d at 1111 (warrant presented to magistrate judge in the District of Kansas asked for permission to search home and vehicle located in Oklahoma); *Glover*, 736 F.3d at 510 (warrant presented to district court judge in the District of Columbia asked for permission to install tracking device on vehicle located in Maryland). As a consequence, the courts concluded that the warrants were invalid at the time they were issued because the territorial limitations of Rule 41 (and in *Glover*, of Title III) did not authorize the judges to issue warrants for searches in other districts. *Krueger*, 809 F.3d at 1116-17, 1118 (Gorsuch, J., concurring); *Glover*, 736 F.3d at 515.   Here, in contrast, the NIT Warrant application presented to the magistrate judge asked for permission to search the activating computers—wherever located—that accessed the Playpen server located in the Eastern District of Virginia. Unlike the warrants in *Krueger* and *Glover*, the NIT warrant did not specify that the search would occur only outside of the Eastern District of Virginia, and since the warrant also contemplated a search within the authorizing judge's district, it was not presumptively invalid at the time it was issued. *Cf. United States v. Moreno-Magana*, No. 15-CR-40058-DDC, 2016 WL 409227, at *14-15 (D. Kan. Feb. 3, 2016) (distinguishing *Krueger* and rejecting claim that warrant issued by Kansas state court judge to search phone was void ab initio because, at time warrant was issued, precise location of phone was unknown; thus, unlike in *Krueger*, where both law enforcement and issuing magistrate knew that the property to be searched was not within the magistrate's district at time warrant was issued, "[t]he warrants here did not authorizing pinging of phones that the issuing judge knew to be outside Kansas").

Most of the courts that have considered *Levin* have rejected Judge Young's suppression order .   In *United States v. Werdene,* No. 2:15cr434, 2016 WL 3002376 at § V, pt. C, *¶ 6,* slip. op. at 27-28 (E.D. Pa. May 19, 2016*)* a district judge in the Eastern District of Pennsylvania found that the government's violation of Rule 41 was nonconstitutional, did not offend concepts of fundamental fairness or due process, and that suppression could not be granted on prejudice grounds.   The same district judge also found that, contrary to Judge Young's ruling, "the good faith exception is not foreclosed in the context of a warrant that is void *ab initio*" and that it was up to the court to determine if it applies.   The district judge in *Werdene* ultimately applied the good faith exception to the NIT warrant and held that "[e]xclusion of the evidence in this case would serve only to punish the errors of judges and magistrates and would not have any 'appreciable' effect on law enforcement." *Id*. at 32; s*ee also Michaud*, 2016 WL 337263, at \*6-7 (finding violation of Rule 41(b) but suppression unwarranted because the defendant was not prejudiced and FBI agents acted in good faith); *Epich*, slip. op. at 5, 23-24 (rejecting defendant's contention that Rule 41 was violated and finding suppression unwarranted even if it was); *United States v. Stamper*, No. 1:15cr190, slip. op. at 19-20 (S.D. Ohio February 19, 2016), ECF No. 48 (the NIT warrant was not unconstitutional in its scope and there is no basis to dismiss the indictment, or suppress the evidence seized as a result of the NIT, and "even if the Court were to find that the NIT Search Warrant was unconstitutional because the use of the NIT allowed the FBI to extend its search to computers outside the Eastern District of Virginia, the Court finds that suppression is not required… [t]he *Leon* good-faith exception applies in this case;"; *Darby*, 2016 WL 3189703 \*22-23 (analogizing the NIT warrant to a tracking device, which may be installed in one district and continue to operate if moved into another district, the court held "as currently

written Rule 41(b) gave the magistrate judge authority to issue the NIT Warrant… [b]ut even if

there were a Rule 41(b) violation, suppression would not be appropriate.")

## **CONCLUSION**

For the foregoing reasons, Defendant's Motion to Suppress should be denied.

Respectfully submitted,

CRMEN M. ORTIZ
UNITED STATES ATTORNEY

By:/s/ David G. Tobin
DAVID G. TOBIN
Assistant United States Attorney

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the
registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ David G. Tobin
DAVID G. TOBIN
Assistant United States Attorney

Date: June 17, 2016