## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 15-10347-PBS |
| | ) | |
| VINCENT C. ANZALONE, | ) | |
| | ) | |
| Defendant. | ) | |

### GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS

Now comes the United States of America, by and through attorneys, Carmen M. Ortiz,
United States Attorney for the District of Massachusetts, and David G. Tobin, Assistant United
States Attorney, and submits its response in opposition to Defendant's Motion to Dismiss
[Docket No. 52].   Without an iota of support in the record, Defendant argues that the Federal
Bureau of Investigation's ("FBI") conduct in the investigation, which resulted in Defendant's
arrest on child pornography related charges, was "outrageous," had "no legal justification or
excuse and offend[ed] common standards of decency."   Docket No. 52, at page 1.    The
Defendant is wrong.   In describing the work done by the FBI in this case, a District Judge in the
Eastern District of Virginia wrote "[t]he FBI agents in this case did the right thing," and "[t]he
FBI should be applauded for its actions in this case."   *United States v. Darby*, *United States v.
Darby*, No. 2:16cr36, 2016 WL 3189703 at*25 and 26 (E.D. Va. June 3, 2016).   For the reasons
set forth below, Defendant's motion should be denied.

### INTRODUCTION

The facts of this case are fully explained in the Government's Opposition to Defendant's
Motion to Suppress [Docket No. 58], and need not be restated here in detail.   It is sufficient to
state that in order to combat the scourge of child pornography, the FBI allowed a website noted
for its child pornography content to operate for a short period of time after it was seized by

federal agents.    During that short period of time (February 19, 2015 to March 4, 2015), the FBI

deployed a Network Investigative Technique ("NIT") on the website, which had been authorized

by a Magistrate Judge in the Eastern District of Virginia.    Deployment of the court-authorized

NIT on the seized child pornography website allowed the FBI to collect limited identifying data

from users, who logged onto the website.    The investigation resulted in the identification of

hundreds of individuals who possessed, received, or distributed child pornography.

Additionally, as of early January 2016, use of the NIT in this investigation led to the

identification or recovery from abuse of 26 children.    See Ex. A, which is attached.    To even

suggest that the actions of the FBI "would appall the average citizen," as Defendant did in his

Motion to Dismiss at page 3, demonstrates Defendant's complete lack of understanding of the

pernicious nature of the crimes that he and so many others have committed against children.

## LEGAL STANDARD & ARGUMENT

"The outrageous [government conduct] doctrine permits dismissal of criminal

charges only in those very rare instances when the government's misconduct is so appalling and

egregious as to violate due process by 'shocking… the universal sense of justice.'"    *United

States v. Luisi*, 482 F.3d 43, 59 (1st Cir. 2007) (quoting *United States v. Russell*, 411 U.S. 423,

432 (1973), quoting *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246 (1960)).

"[W]hile the doctrine is often invoked by criminal defendants, it has never been successful in this

circuit."    *Id.* at 59.    *See United States v. Santana*, 6 F.3d 1, 4 (1st Cir. 1993)(collecting First

Circuit cases rejecting the argument); *United States v. Panitz*, 907 F.sd 1267, 1272-73 (1st Cir.

1990)(collecting additional First Circuit cases rejecting the same argument); *see also, e.g.,*

*United States v. Capelton*, 350 F.3d 231, 243 n. 5 (1st Cir. 2003)(rejecting the argument on the

facts presented); *United States v. Nunez*, 146 F.3d 36, 38-39 (1st Cir. 1998)(same); and *United*

*States v. Maitiz*, 14 F.3d 79, 82-83 (1st Cir. 1994)(same).    Judge Selya aptly pointed out "the practice is moribund; in practice, courts have rejected its application with almost monotonous regularity" and "[t]he historical record makes it clear, therefore, that the outrageous misconduct defense is almost never successful."    *United States v. Santana*, 6 F.3d at 8.

"Even a willing defendant may claim a violation of due process if the government's conduct has reached a 'demonstrable level of outrageous'" *United States v. Bradley*, 820 F.2d 3, 10 (1st Cir. 1987)(quoting *United States v. Porter*, 764 F.2d 1, 8 (1st Cir. 1985), quoting *Hampton v. United States*, 425 U.S. 484, 495 n. 7 (1076)).    "Mainly these cases involve alleged overinvolvement on the government's part in manufacturing the crime… [e]ven here, a defendant may be barred from claiming outrageousness if he has been too active himself."    *Id*. at 10.    The First Circuit further noted in *Bradley,* "[b]ut, of course conduct may take other forms, and might well be found in a threat of serious physical harm."    *Id.*

The government has found only two reported decisions in which federal appellate courts have reversed a conviction for outrageous government conduct.    See *United States v. Twigg*, 588 F.2d 373, 381 (3d Cir. 1978) (holding government conduct outrageous because it "generated new crimes by the defendant merely for the sake of pressing criminal charges against him when . . . he was lawfully and peacefully minding his own affairs"); and *United States v. Greene*, 454 F.2d 783 (9th Cir. 1971) (holding government conduct outrageous where it had initiated a criminal scheme and was involved for two and a half to three and a half years "directly and continuously . . . in the creation and maintenance of criminal operations").

When the government seized Playpen, it admittedly had no reason to suspect Defendant as it had not identified him.    It did, however, have ample reason to suspect any member of

Playpen (which turned out to include Defendant) was actively viewing and sharing child pornography.

As the affidavit in support of the NIT warrant explained, between September 2014 and February 2015, undercover FBI agents connected to Playpen in order to document its content and attempt to identify site users.   Ex. A, p. 13, ¶ 11.   Playpen became a focus of investigation precisely because its members were actively advertising, distributing, and accessing child pornography.   Id., p. 10, ¶ 6.   Images and videos that were advertised, distributed, and accessed through the site were highly categorized according to the gender and age of the victims portrayed—e.g., "jailbait," "pre-teen" and "toddlers"—as well as the type of sexual activity depicted, such as hardcore ("HC") or softcore ("SC") child pornography.   Id., pp. 15-17, ¶¶ 14-18.   The images and videos comprised all manner of child sexual abuse, including "an adult male's penis partially penetrating the vagina of a prepubescent female," and "an adult male masturbating and ejaculating into the mouth of a nude, prepubescent female."   Id., pp. 17-20, ¶¶ 18-25.   Tellingly, the sub-section of Playpen that had the greatest number of postings was "Pre-teen" videos dubbed "Girls HC," where users viewed and shared hardcore pornographic images of pre-teen girls.   Id., p. 16, ¶ 14.   Playpen also featured image and file hosting and a chat forum, all of which allowed users to upload links to child pornography.   Id., pp. 19-20, ¶¶ 23-25.   As Judge Bryan observed in the *Michaud* case, the NIT warrant affidavit demonstrated that Playpen was "unmistakably dedicated to child pornography."   *United States v. Michaud*, No. 3:15-CR-05351-RJB, 2016 WL 337263, at *5 (W.D. Wash. Jan. 28, 2016).   And of course, all of this activity occurred before the FBI ever assumed control of Playpen.   The FBI thus had every reason to suspect Playpen users were actively engaged in the illegal viewing and sharing of child pornography.

**The government played no role in creating the crime for which Defendant is charged**

The government did not create Playpen.   It had been in operation for months when the government, with court authorization to investigate ongoing child sexual exploitation, seized the site in February 2015.    Nor, importantly, does the government bear any responsibility for Defendant's years-long interest in, and consumption of, child pornography.   The only person to blame for the thousands of images of child pornography on Defendant's computer is Defendant himself.   Courts have recognized that "outrageous" conduct is more likely to be found were the government fabricates the crime and then invites the defendant along for the ride.   *See, e.g., United States v. Mayer*, 503 F.3d 740, 754 (9th Cir. 2007) (finding no outrageous government conduct and noting that the defendant was the first to broach the subject of traveling internationally to have sex with boys).   That is plainly not the case here.

**The government did not encourage Defendant's participation in the criminal conduct**

The investigation revealed that Defendant originally registered an account on "Playpen" on February 19, 2015.   Further, according to the statistics section of his user's profile, Defendant had been actively logged into "Playpen" for a total of 12 hours, 1 minute, and 24 seconds between the dates of February 19, 2015 and March 5, 2015.

The government did not force, coerce, or entice Defendant to act on his prurient sexual interest in children and cannot be held responsible for Defendant's despicable crimes.   The entire purpose of the deployment of the NIT was to protect children from people such as Defendant, who victimize children by the possession and trade of child pornography.   Law enforcement had no direct contact with Defendant during the period when it had administrative control of the website.   The most that can be said is that the government briefly operated a

website that Defendant used to access child pornography.    Defendant needed no encouragement from the government to do so.

## The government was not responsible for Defendant's criminal conduct

The duration of the government's operation of Playpen was exceedingly brief:    two weeks.    Playpen itself operated for at least six months before that.    Additionally, the nature of the government's involvement with Playpen was circumscribed.    And the government's conduct falls far closer to the observer end of the spectrum.    The FBI did not post any images, videos, or links to child pornography on the website.    Playpen's users were responsible for that content.      While it is true that images, videos, and links posted by site users (both before the FBI assumed administrative control and after) generally remained available to site users for some limited period of time, for reasons explained below, removing all of that content would have jeopardized the investigation into the very users who possessed, distributed, and accessed it.

Defendant claims that law enforcement made no effort to curtail the redistribution of child pornography through Playpen or to determine whether images posted pertained to new, as opposed to known, images of child pornography.    Not so. While Playpen operated under FBI administrative control, FBI Special Agents monitored all site postings, chat messages, and private messages continuously to comply with Title III monitoring requirements and to assess and mitigate risk of imminent harm to children.    In the event that FBI Special Agents perceived a risk of imminent harm to a child, agents took actions to mitigate that risk and immediately forwarded available identifying information, including NIT results, to the appropriate FBI office. Actions taken in any particular instance were tailored to the specific threat of harm.

Finally, no one could doubt that Defendant had the technical expertise and resources to commit the charged crimes without the government's intervention.    By his own admission, he

had been consuming child pornography for years.    Defendant, not the FBI, registered for an

account with Playpen.    Defendant , not the FBI, downloaded images of child pornography.

In sum, the duration of the government's involvement was brief; its role was minimal; and

Defendant committed these crimes all on his own.

**The government's conduct was necessary given the use of an anonymous network by Playpen users to conceal their locations and identities**

There can be little doubt the government's investigative approach was necessary.    As

the government explained to the judges who authorized the NIT and the Title III and as those

two judges apparently agreed, the brief, continued operation of Playpen in order to deploy the

NIT was necessary to identify individuals actively sharing child pornography.    Defendant and

the other Playpen users used technology to conceal their identities and locations, not for fear of

discovery of some lawful, if to many, distasteful, pursuit.    To the contrary, they sought a safe

haven where they could share child pornography without fear of law enforcement intervention.

But for the government's investigation, these offenders would have succeeded in remaining

hidden.    The government explained, in great detail, the problem it faced in identifying these

criminals and why other investigative alternatives were simply not likely to succeed.    Ex. A, pp.

22-24, ¶¶ 29-32.

Defendant claims that the government should have identified him and his fellow

offenders differently.    But his proposal, perhaps unsurprisingly, fails to account for the sort of

advanced technical means that he and other Playpen users employed.    As the government

explained in the application for the Title III authorization: in order for the NIT to have an

opportunity to work, members had to be able to continue to access the site, with as minimal an

interruption in the operation of the site as possible, so as to not create suspicion that a law

enforcement interdiction was taking place.   Ex. B, p. 37, ¶ 61.   The affidavit specifically noted that interruptions in the service of the Playpen website, and others like it, would be a tip-off to suspects that law enforcement infiltration was taking place.   *Id.*

Agents considered seizing Playpen and removing it from existence immediately.   *Id.*, p. 41, ¶ 72.   Indisputably, doing so would have ended child pornography trafficking on Playpen. It should come as no surprise, however, that the problem extends far beyond Playpen. Shutting down Playpen immediately would have squandered any hope of identifying and apprehending the offenders responsible for truly abhorrent conduct.   *Id.*   It also would have frustrated agents' attempts to obtain information that could help identify and rescue child victims from ongoing abuse.   *Id.*   Accordingly, it was the judgment of law enforcement that the seizure and continued operation of Playpen for a limited period of time, paired with the deployment of a NIT and monitoring of user communications, was necessary and appropriate in order to identify Playpen users.   *Id.*   Two federal judges obviously agreed.

Stopping the unlawful possession and dissemination of child pornography, and rescuing children from ongoing abuse and exploitation, requires more than just shutting down a facility through which such materials are disseminated.   Law enforcement must identify and apprehend the perpetrators.   Here, the FBI briefly assumed administrative control over an existing facility through which users were already posting and accessing child pornography to deploy a court-authorized investigative technique and engage in court-authorized monitoring of user communications, which were necessitated by the particular anonymizing technology deployed by the users of the site, all in an effort to identify those perpetrators.   Undoubtedly, the decision whether to simply shut down a website like Playpen or to allow it to continue operating is a difficult one for law enforcement, given that users would continue to be able to post and access

child pornography.     Here, that difficult decision, which was disclosed to two different judges, was amply justified by the particular facts of the investigation.     Accordingly, the investigative technique that was used in this case was necessary given the challenges of investigating and prosecuting the type of crime being investigated.

In sum, reasonable people may disagree about whether the benefits of any investigation undertaken outweigh its costs.     That is not the question before the Court, however.     The government took reasonable steps to address a significant challenge to its ability to investigate and prosecute serious crimes against children.     It did so after fully disclosing its intentions to two different judges.     Whatever may be said about what the government did here, it did not act outrageously and certainly not in a matter that offends fundamental notions of fairness.

## CONCLUSION

For the foregoing reasons, the defendant's Motion to Suppress should be denied.

Respectfully submitted,

CRMEN M. ORTIZ
UNITED STATES ATTORNEY

By:/s/ David G. Tobin
DAVID G. TOBIN
Assistant United States Attorney

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ David G. Tobin
DAVID G. TOBIN
Assistant United States Attorney

Date: June 17, 2016